THE OCEANIC.

MARTS et al. v. THE OCEANIC.

HATHEWAY et al. v. MARTS et al.[1]

(Circuit Court of Appeals, Fifth Circuit. February 17, 1896.)

No. 404.

1. ENTRANCE TO HARBOR—NEGLIGENCE OF LICENSED PILOT—STRANDING.
    A licensed pilot, who undertakes to take a ship, with sails up, through a channel such as that leading over the bar of the St. Johns river, Fla., should know the channel, its depths, shoals, and the changes thereof, and should be charged with negligence if he fails to skillfully direct the course of the ship, and give proper supervision and direction to the navigation of the tug which is towing her.

2. SAME—LIABILITY OF TUG—PROXIMATE CAUSE.
    Where a schooner entering a harbor in tow of a tug on long hawser, and with full sails set, was permitted by her pilot to go so near a shoal that she touched upon it, and lost her steerage way, so that she could not, with the aid of the tug, prevent herself from drifting upon a second shoal, where she stranded, and was lost, held, that the negligence of the pilot was the proximate cause of the loss, and the tug was not liable.

Appeal from the District Court of the United States for the Southern District of Florida.

This was a libel in rem by S. B. Marts and others, owners of the schooner Anna T. Ebener, against the steam tug Oceanic, I. H. Hatheway and others, claimants, to recover damages for the loss of the schooner, freight, and cargo, which resulted from stranding while in tow of the tug. The district court found that both the schooner and the tug were chargeable with fault, and entered a decree equally dividing the damages between them. From this decree both parties have appealed.

R. H. Leggett and E. F. Dunne, for Hatheway and others.

E. P. Carver and A. W. Cockrell, Jr., for Marts and others.

Before PARDEE and McCORMICK, Circuit Judges, and BOARMAN, District Judge.

BOARMAN, District Judge. S. B. Marts, of Baltimore, for himself and others named in the libel, brought this suit in the district court for the Southern district of Florida against the steam tug Oceanic, and sets out in the libel, as follows:

[1] Rehearing denied April 21, 1896.

"First. That on or about the 17th day of March, 1894, the said schooner Anna T. Ebener, owned as aforesaid, left the port of New York, loaded with a cargo of stone, for Mayport, Florida; that said schooner was 474 tons register, staunch, strong, and seaworthy, well manned and equipped, and commanded by John L. Speelman, a competent and experienced master, and so continued until after the facts hereinafter stated. Second. That on March 28, 1894, in the morning, the said schooner took on board a duly-licensed pilot, named Charles Wilson; that thereafter the said schooner engaged the tug Oceanic to tow her over the bar of the St. Johns river, Florida, where she then was; that while the said schooner was being towed over the bar, by reason of the improper and negligent manner in which she was being towed by the said steam tug Oceanic the said schooner struck heavily upon the ground, where, by reason of the improper towing of the tug, she had been allowed to drift; that she pounded heavily, and became so severely injured by pounding on the sand that said schooner, her cargo and freight, became a total loss. Third. That by reason of said negligence on the part of the tug the said schooner Anna T. Ebener, of the value of sixteen thousand dollars ($16,000), her freight, of the value of eight hundred dollars ($800), and her cargo, of the estimated value of two thousand dollars ($2,000), became a total loss. Fourth. That the said loss and damage resulting therefrom were caused wholly by the negligence of the said steam tug Oceanic and those in charge of her in improperly towing the vessel and allowing the said schooner to strike upon the sand bar, when, if she had been properly towed by said steam tug, she would not have been injured; that the said schooner Anna T. Ebener, and those on board of her, were wholly without fault."

The claimants, I. H. Hatheway et al. in answering said libel, deny negligence on the part of the tug, and allege that the disaster resulted wholly from the fault of the schooner. The district court below found there was fault on both sides, and ordered the loss to be divided equally. The loss was fixed at $12,800. The pleadings, etc., show and make up cross appeals from the decree, etc., of the district court. Both libelants and defendants, having appealed, filed assignments complaining of errors in the findings and conclusions of the judge a quo. The evidence shown in the transcript makes a history more voluminous than usual, though its recitals are full of such conflicting statements as seem always to attend on discussions, whether in or out of courts, when the subject-matter thereof relates to the historical incidents or facts illustrating a disaster at sea. We will not undertake to review all the evidence shown in the transcript, but will state some of our impressions of the testimony which leads us to differ from the view of the facts and from the conclusions reached thereon by the learned judge of the district court. We are indebted to the learned counsel on either side, who, in discussing orally the facts shown in the record, placed before us two large hydrographic charts showing the water's soundings, shoalings, depths, etc., in and near the channel through which the schooner was being towed. It may be that we were more favored than was the court below in having such illustrative charts before us while hearing the oral arguments. The evidence shows, substantially, that the schooner Ebener, sailing to Mayport, Fla., with a cargo of stone, arrived off the bar about a mile out from Mayport in the forenoon of March 28, 1894, she having taken on board a licensed pilot, employed the tug Oceanic to tow her over the bar. The schooner was drawing about 15 feet of water, and entered the channel about noon, on a receding

tide, it having fallen about a foot or more when the schooner went aground. The wind was from the northeast, and five or six knots. The pilot had told the captain, before entering the channel, that the ship would have 17½ or 18 feet water, and that it was safe to enter. That on entering the channel he gave the tug directions as to the course he wished to take. The schooner, on entering the channel, was practically under full sail. Later, when the ship touched on the first shoal, the pilot ordered some of the sails down, and when the schooner was fast aground, at the point where she was lost, she had all lower sails on except the outward jib. The schooner registered at 474 tons, and was sailed in the channel by her captain and one seaman, under the direction of the pilot. The tug was a large, strong, staunch steamer, with an experienced licensed captain with full crew, two men at the wheel, and the captain near by, watching the tow. The Clyde steamship sailing line enters from the sea at the east end of the channel, and runs along the middle thereof, near to the place of the disaster, and from thence it runs a little south of west. The depth of the channel, at the entrance, for the first few hundred feet, along the Clyde line ranges from 29 at the entrance to about 17 feet near to the east end of the first shoal, and from thence on through the channel, along said line, varies from 17 feet to about 14 feet. These depths are the mean low-water depths. High tide adds to them from 3 to 5 feet. The ship was drawing about 15 feet, and with her sails up the principal use she had for the tug was for the tug to keep the tow's head in the channel up to the wind. The tug's hawser was about 380 feet long. At the time of the loss of the schooner the jetties had not been completed, and the channel for large sailing vessels, about 500 feet wide, was to the south side of the south jetty. Chart No. 1 shows the channel and shoal depths on March 9, 1894, and chart No. 2 shows the same on April 2, 1894. The first chart was made 19 days before, and the other chart 5 days after, the disaster. Both charts show a "kidney-shaped shoal" lying near the middle of the channel, at the eastern end thereof, about 200 feet from the entrance of the channel, with its points to the southward; its length being east and west about 325 feet, with an average width of 100 feet. The second chart shows that the southern side or points of the shoal had changed their formation, and had extended outwardly further to the south. The soundings show water along the south side of the said shoal to be about 14 feet. The pilot says he got too close to and he "touched a little" on the south side of said shoal. The soundings show better depths on the north side than those on the south side of the shoal. Chart No. 2 shows that the south bank of the second shoal or obstruction shown in chart No. 1 had also changed by moving northward about 60 feet, thereby lessening to that extent the width of the channel. The tow came in along the Clyde line, following the tug, at the end of the hawser about 380 feet; the hawser never having become taut until after the ship touched on the first shoal. The tug was running under slow bells, and kept to the windward, along, but a little south of, the Clyde sailing line. The

hawser being loose until the ship touched on the first shoal, she could have sailed at 5 or 5½ points of the wind, and the pilot could have chosen for himself, so far as the tug's movements were concerned, such depths along the Clyde sailing line as he might have preferred; and she could have gone to the north side of said line, or to the north side of said shoal, if the pilot had chosen to do so. That the schooner, while sailing to the leeward of the tug, "touched a little," as the pilot says, in the shallow water, on the south side of the first shoal, in which water she would not respond to her helm, and she was pushed more or less by the sea and wind further to the leeward, so that within a few minutes thereafter, and within a few hundred feet thereof, she went upon the second shoal, and began to pound and thump on and over the ground where she was lost. Until the ship touched, she, following under full sail along behind the tug, had given no signal to the tug for any purpose. After she touched the first time, the pilot signaled to the tug with his hat or hand and voice to keep further to the northward. The tug could not hear what was said, but saw the hat or hand signal, and, though she was well to the northward then, she endeavored to keep further to the northward, where she remained until the ship had struck, and was grounding, on the second shoal. That it then became impracticable for the tug to aid her further in her purpose to get her head again to the wind, or to withhold her from the effect of the sea and wind, which was pushing her to the leeward. From the time the tug entered the port, pulling the ship, until the fatal grounding on the second obstruction, only about 15 or 20 minutes had elapsed when the ship became so hard aground that the tug, with the assistance of two other tugs, tried in vain for several hours to release her.

The above statement of facts does not vary much from the findings of the court below. The material difference between our findings of fact and those of the court below are as to the place where the ship first struck, as to there being deeper water on the north than on the south of the "kidney-shaped shoal," as to the time at which the pilot began to signal to change the tug's direction. The court below, in concluding its opinion, says:

"Had the pilot of the schooner, instead of mistaking the shoal in mid-channel for the windward bank. kept further to the north, and more to the windward, as might have been done at first, before the schooner touched at all, said touching and consequent loss of control of the helm would have been avoided; or, had the officers of the tug been watchful in keeping close to the jetty, and looked out for the signals from the pilot, I am satisfied this disastrous effect might have been overcome. A different and a more careful procedure on the part of either pilot or the tug would have prevented the loss. and it must be borne equally by schooner and tug."

The court below seems to have been of opinion that the schooner, having by faulty navigation on the part of the pilot struck the first shoal, lost her steerageway, and thereafter not being able to recover herself, and bring her head to the wind, drifted down to the leeward until she struck again and became fast aground. If the court is correct in its conclusion that the steerageway of the vessel was lost as the consequence of bad navigation of the pilot,

it would appear that the first negligence in the navigation of either craft was the negligence of the pilot, which we find stated in the suggestions of the court below.    In connection with what we have just quoted, the court says the disastrous results following the loss of the ship's steerageway—that is, the running of the ship onto the second obstruction—might have been overcome by the tug if it had kept the ship more to the windward.   ,So without, just now, interposing our view of the facts, it would seem that under the view the court below took of the facts showing the pilot's negligence, and the results therefrom, the proximate cause of the loss of the schooner inhered in and sprung out of the pilot's want of skill in navigation in allowing his ship to run on the first shoal, so that in the shallow water thereof she lost her steerageway.

The evidence, as we give weight to the conflicting statements of the witnesses on either side, leads us to conclude:

First. That the pilot, when he was about to enter the channel on a receding tide, misled the captain of the schooner by telling him he would have 17½ to 18 feet of water, when, in fact, there was hardly water enough at that time, along the south side of the first shoal, to float the schooner; that the ship, as libelants show, with full sail set, needed the tug only to keep the ship's head to the windward in the channel; that all the circumstances attending either vessel made it essential for the safety of the ship that the pilot should skillfully navigate the tow, and as well give proper supervision and direction to the course of the tug.    It is clear that a pilot, who undertakes to steer a ship with full sails up, through a channel like the one in question, should know the channel, its depths, shoals, and the changes thereof, and should be charged with negligence if he fails to skillfully direct the course of the ship and give proper supervision and direction to the navigation of the tug.    Under our view, the pilot should have known of the changes which, a few days before the disaster, had occurred in the formation, etc., of the first shoal, and of the depths of water thereon; and in allowing the vessel to strike thereon he was guilty of the first faulty navigation and negligence that was committed by either vessel. And if it be true, as the libelants' evidence shows it to be, that the water where the ship first "touched a little" was so shallow, near the south side of the first shoal, that the ship would not respond to the helm, and that she, consequently, at that place, lost her steerageway, it seems clear that such negligence was the proximate cause of the loss of the schooner.    See The Energy, L. R. 3 Adm. & Ecc. 48; Molenbrock v. Packet Co., 16 Fed. 878; The Mosher, 4 Biss. 274, Fed. Cas. No. 9,874.

Second. That the pilot, before the ship touched the first shoal, could have sailed either to the windward or leeward of the tug, and could have gone on either side of the first shoal that he preferred; that until after the ship "touched a little," and lost her steerageway in the shallow water on the south side of the said shoal, he had made no changes in the ship's sails and had not signaled the tug for any purpose; that at the time, when he was giving the said signal, with his hat or hand or voice, or immediately thereafter,

the ship had begun to thump and pound on the shoal, where she finally grounded; that the tug could not understand the voice, but understood the signals as directing her to keep to the windward; that at the time the tug was so signaled she was, as she had been since entering the channel, well up to the windward of the ship, and endeavored to obey, and did obey, as far as was practicable, the signals as the tug understood them; that when the signals came to the tug, or immediately thereafter, the schooner had already struck upon the second shoal obstruction, and was being driven by the sea and wind further on the ground where she was lost.

We are of the opinion that the pilot on the schooner, however skillful and experienced he may have been theretofore in navigating the said channel, was guilty of faulty and unskillful navigation of the schooner, and that he was negligently at fault in not giving such timely signals for the navigation of the tug as libelants' testimony shows should have been, and were not, timely given, as the ship, practically, with full sail, was entering the shallow water along the south side of the first obstruction. We are disposed to conclude that the ship, though she "touched a little," as the pilot says, in the shallow water of the first shoal, was not imperiled, if at all, by so touching, and that she did not lose her momentum power forward, and was not drifting helplessly to the leeward when she went upon the second shoal, but that she, having passed over the first shoal, was allowed by the errors of judgment or further faulty navigation on the part of the pilot to run upon the fatal shoal. Such errors of judgment or faulty navigation as we have charged the pilot with might not, in law, amount to negligence; but out of them, whether we take our own view of the facts or the view which the lower court seems to have had of them, sprung the proximate cause of the loss of the ship. It is contended, on the part of the libelants, in support of their cross appeals, that the tug was generally at fault, and especially was she at fault in not, after having entered the channel, continuously held herself and the ship to the windward. The case shows that the tug at any rate had followed and obeyed all the directions received (if any intelligible signals were given to the tug) from the pilot up to the time when the ship was about to run upon the second obstruction, when she grounded. It was the duty of the pilot not only to safely navigate the ship upon which he was, but to timely give direction and supervision to the course of the tug. On this point we find that, even though the tug may not, after entering the channel, have kept as far to the northward as was practicable, yet, as the pilot had failed to signal the tug, for any purpose at all, after entering the channel, until after the perilous second shoal was about to be reached, such conduct on the part of the tug should be chargeable to the pilot, rather than to the officers of the tug herself.

We conclude that, whatever were the contributions the tug may have made to the disaster, the fault out of which said contributions may have grown is chargeable to the pilot, and the tug is free

from any liability in .this suit for the loss, or any part thereof, that was incurred by the libelants. Therefore it is ordered that the decree of the district court be reversed, and that libel be dismissed, at cost of libelants.