JENKINS & REYNOLDS CO. v. ALPENA PORTLAND CEMENT CO.

(Circuit Court of Appeals, Sixth Circuit.    July 10, 1906.)

No. 1,519.

**1. TRIAL—DIRECTION OF VERDICT.**

A motion for the direction of a verdict for defendant should be sustained unless there is evidence favoring such of the ultimate or constitutive facts of plaintiff's case as have been put in issue to a substantial degree, and in determining this question all inferences reasonably to be drawn therefrom most favorable to plaintiff must be taken.

[Ed. Note.—For cases in point, see vol. 46, Cent. Dig. Trial, §§ 332, 342, 402.]

**2. SAME.**

A motion for a directed verdict in favor of defendant should be overruled if there is substantial evidence favoring such ultimate facts of the plaintiff's case as have been put in issue to a substantial degree, though also there is evidence opposing and conflicting therewith, no matter how strong such opposing evidence may be.

[Ed. Note.—For cases in point, see vol. 46, Cent. Dig. Trial, § 342.]

**3. CONTRACTS—EXECUTION—REDUCTION TO WRITING.**

Though parties to a verbal agreement contemplate that it is to be reduced to writing and signed, yet if the understanding is that this is to be done simply as a memorial of the agreement, the contract is binding, notwithstanding it is never put to writing.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts, § 159.]

**4. SALES—CONTRACTS—EXECUTION—QUESTION FOR JURY.**

In an action for breach of an alleged contract for the sale of cement, evidence *held* to require submission of the question whether the contract was in fact made to the jury.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Sales, § 145.]

**5. PRINCIPAL AND AGENT—AUTHORITY OF AGENT.**

Defendant employed M. as his chief salesman, and during the years 1901, 1902, and 1903, M. made diverse sales of cement on defendant's behalf, ranging from 2,000 to 7,500 barrels. In February and March of 1902 plaintiff wrote defendant for prices on from 5,000 to 10,000 barrels of cement delivered at Chicago, and 5,500 barrels delivered at other places. In each instance defendant answered through M., offering to sell the quantity wanted at specified prices, after which defendant, through M., made a contract to sell plaintiff 35,000 barrels of cement at a specified price. *Held,* that, in the absence of evidence that there was any limitation on M.'s authority to sell, as to the amount sold, and that plaintiff was chargeable with notice thereof, such facts were sufficient to show that M. had authority to make the contract.

**6. SALES—CONTRACT—WHAT LAW GOVERNS.**

Where an alleged contract for the sale of cement was made in Illinois, it was governed by the law of that state.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Sales, § 2.]

**7. FRAUDS, STATUTE OF—CONTRACT FOR THE SALE OF GOODS.**

A contract for the sale of 35,000 barrels of cement at a specified price per barrel, to be delivered during six months in quantities of 6,000 barrels per month, or in such quantities as should be ordered by plaintiff from month to month, was not within the Illinois statute of frauds.

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

147 F.—41

Edwin C. Crawford, for plaintiff in error.

Joseph H. Cobb, for defendant in error.

Before LURTON and SEVERENS, Circuit Judges, and COCH-RAN, District Judge.

COCHRAN, District Judge. The plaintiff in error, Jenkins & Rey-nolds Company, an Illinois corporation and a dealer in brick and cement, doing business at Chicago, Ill., was plaintiff below, and the defendant in error, Alpena Portland Cement Company, a Michigan corporation, and a manufacturer and seller of Portland cement, doing business at Alpena, Mich., was defendant below. The action was brought to recover damages for breach of contract. The declaration contained four counts, the last two of which were common counts. The first count alleged specially that on April 9, 1902, in Chicago, plaintiff and defendant entered into a contract whereby plaintiff agreed to buy from defendant, and defendant agreed to sell plaintiff, 35,000 barrels of Portland cement at the price of $1.30 per barrel in cloth sacks, or $1.35 per barrel in paper sacks, to be delivered at Chicago, freight prepaid, during the period of six months from said date, in quantities of 6,000 barrels per month, or in such quantities as should be ordered by plaintiff from month to month, and to be paid for on the 20th day of each month for the amount delivered during the pre-ceding month; that defendant had failed and refused to deliver any portion of said cement, except 661 barrels thereof delivered in April and May, 1902; and that plaintiff had been damaged in the sum of $20,600, for which judgment was sought. The second count alleged specially substantially the same facts as alleged in the first count, though in somewhat different phraseology, and, in addition, that de-fendant agreed further that it would give plaintiff the exclusive agency of the state of Illinois, northern Indiana, and southern Wisconsin during said period of time for the sale of its cement, and that on April 15, 1902, plaintiff wrote defendant a letter referring to the contract so made, and ordering five carloads of cement on account thereof, in response to which order said 661 barrels of cement were delivered. The defendant pleaded the general issue, and by way of recoupment an indebtedness in the sum of $2,000 on account of cement sold and delivered. On the trial the lower court, upon defendant's motion, at the close of plaintiff's evidence peremptorily instructed the jury to find for the defendant on plaintiff's declaration, and in the sum of $1,048.13 for said 661 barrels of cement on its plea of recoupment. The jury so found, and judgment was rendered accordingly, from which this writ of error has been taken.

The principal error assigned, and the only one argued, is the action of the lower court in directing a verdict for the defendant. To prop-erly dispose of this error it is necessary to have well in mind the rules that should govern a trial court in disposing of a motion to direct a verdict for defendant when made by him at the close of such evidence as has then been introduced. These rules have been stated, and in a certain particular vindicated, by this court on a number of

occasions, mainly in the following cases, to wit: Mt. Adams, etc., Ry. Co. v. Lowery, 74 Fed. 643, 20 C. C. A. 596; Felton v. Spiro, 78 Fed. 576, 24 C. C. A. 321; Travelers' Ins. Co. v. Randolph, 78 Fed. 754, 24 C. C. A. 305; Minahan v. Grand Trunk Western Ry. Co. (C. C. A.) 138 Fed. 137; Coulter v. B. F. Thompson & Co. (C. C. A.) 142 Fed. 706. They may be said to be three in number.

The first one is this: The motion should be sustained unless among such evidence as has been introduced there is evidence favoring such of the ultimate or constitutive facts of plaintiff's case as have been put in issue to a substantial degree. By substantial evidence is not meant that which goes beyond a mere scintilla of evidence. Evidence may go beyond a mere scintilla, and yet not be substantial. Judge Severens pointed this out in the Minahan Case in these words:

"Undoubtedly, it is distinctly settled that a mere scintilla—a spark— which arrests attention and then from mere lack of vitality fades away, is not sufficient to warrant the submission of an issue of fact to a jury where the scintilla is all that is developed by the party having the burden of proof. Such a showing has no substance, has not the quality of proof, and the judge may lawfully say so to the jury. And it must be admitted that the Supreme Court has gone a step further than this, and assigned to the province of the court the right to direct the jury in those cases standing between those where there is a mere scintilla and those where there is substantial evidence; standing in a borderland, so to speak, where the evidence is so vague, indefinite, or inconsequential as not to furnish a reasonable foundation on which a verdict could rest."

He indicated somewhat more particularly what is meant by substantial evidence in these words:

"Something of substance and relevant consequence, and not vague, uncertain, or irrelevant matter, not carrying the quality of 'proof,' or having fitness to induce conviction."

What constitutes such evidence may be indicated in another way. If the evidence favoring such facts of the plaintiff's case is such that reasonable men may fairly differ as to whether it establishes them, then it is substantial. If, however, it is such that all reasonable men must conclude that it does not establish them, then it is not substantial. We gather this from these words of Mr. Justice Lamar in the case of Grand Trunk R. Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485:

"When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court."

The next rule is this: In determining whether among the evidence that has been introduced there is evidence which favors such facts of the plaintiff's case to a substantial degree that view of such evidence and all inferences reasonably to be drawn therefrom most favorable to the plaintiff is to be taken.

And the last one is this: The motion should be overruled if among the evidence that has been introduced there is substantial evidence favoring such facts of the plaintiff's case, and this though among it

also there is evidence opposing such substantial evidence and conflicting therewith, no matter how strong such opposing evidence is. In passing on such motion it is not the province of the court to compare the substantial evidence favoring such facts of the plaintiff's case with that which opposes or conflicts therewith. The latter should be completely ignored, as much so as if it were out of the case, and the attention of the court should be confined to the evidence favoring such facts of the plaintiff's case, and to a determination of its positive character, i. e. whether it is substantial or not. It is the jury's province to make such comparison. It is never the court's province to do so except after verdict on a motion to set it aside and grant a new trial. In the Spiro Case Judge Taft said:

"The mental process in deciding a motion to direct a verdict is very different from that used in deciding a motion to set aside a verdict as against the weight of the evidence. In the former there is no weighing of plaintiff's evidence with defendant's. It is only an examination into the sufficiency of plaintiff's evidence to support a burden, ignoring defendant's evidence. In the latter it is always a comparison of opposing proofs."

The evidence introduced at the time the motion is made may be limited to that introduced while plaintiff is presenting his case, or it may include, also, that introduced while defendant is presenting his case. The rules stated are applicable in either case, though in the former case there is greatly less likelihood of the evidence that has been introduced including any that opposes or conflicts with that favoring such facts of the plaintiff's case, so as to present an opportunity for making a comparison. It is possible, however, that it may include such opposing or conflicting evidence. It may have been introduced irregularly by defendant, or inadvertently or otherwise by plaintiff. If it does, the rules are not different from what they would be had it been introduced by defendant while presenting his case.

The case in hand is one where the motion to direct a verdict, the granting of which is complained of, was made at the close of the evidence introduced while plaintiff was presenting its case. The question presented by the assignment of the granting of said motion as error, therefore, is whether, taking the most favorable view of the evidence so introduced and all inferences reasonably to be drawn therefrom, there was among it any substantial evidence favoring the ultimate or constitutive facts of plaintiff's case, all of which were put in issue: or, in other words, taking such view, is it to be said that reasonable men may fairly differ as to whether the evidence among it favoring such facts established them, or that all reasonable men would conclude that it did not.

There is no question but that breach of the alleged contract, assuming it to have been made, was established by said evidence, and it is not claimed on behalf of plaintiff in error that it warranted the submission to the jury of the fact as to the making of a contract such as that set forth in the second count of the declaration, involving, as it does, an agreement to give plaintiff an exclusive agency. It is only claimed that it warranted such submission of the making of a contract

such as that set forth in the first count. As to whether it did or not, then, is the sole question in the case. The contract was claimed to have been made on April 9, 1902, in plaintiff's office in Chicago, Ill., and by George C. Gray, plaintiff's treasurer, acting on its behalf, and John Monaghan, defendant's chief salesman, acting on its behalf. The position of the defendant in error (putting it as it must be in order to be of any avail) is that among the evidence introduced there was no substantial evidence favoring such a claim, because all reasonable men must conclude from a consideration of such of said evidence as favored said claim that no contract was then made, either for the reason that said Monaghan's action on that occasion went no further than to give the plaintiff an option to purchase the quantity of Portland cement alleged on the terms alleged, which option was never accepted, or for the reason that, though the terms of a contract of sale may have then been agreed on, its conclusion was postponed until they should be reduced to writing and signed, which was never done, or that said Monaghan was without authority to make the contract on defendant's behalf.

Consideration will first be directed to the evidence relating to the making of the alleged contract; and here first, in so far as it bears on the question as to whether what took place on the occasion in question amounted to more than defendant's giving plaintiff an option. This evidence consisted of the testimony of said Gray and of one John J. Sullivan and certain letters that passed between the parties hereto. Said Gray testified on direct examination in part as follows:

"Q. Now you may state as fully as you can remember the conversation between you and Mr. Monaghan on April 9th? A. Well, we immediately took up the question of supplying the quantity of cement, whether they were in position to supply us, and the price. He told us that he could furnish us the cement, and we told him that we wanted to make an agreement, and we agreed upon the price of one dollar and thirty cents per barrel. We told him that we would want a certain quantity at the price of one dollar and thirty cents if he could furnish it, and he said he could, and it was agreed that the quantity should be from twenty-five thousand barrels to thirty-five thousand barrels; the twenty-five thousand barrels to be the minimum amount to be ordered and the thirty-five thousand was to be the maximum. The Court: That is what you told him you wanted? A. We wanted more than that, your honor. The Court: You mean to say that the minimum amount to be ordered was twenty-five thousand barrels and thirty-five thousand barrels was the maximum agreed to be furnished? A. Yes, your honor. Q. During what year was it to be delivered? A. 1902, furnishing it so that it would be delivered before December 1. 1902. Q. That is the whole of it by December 1st? A. Yes, sir. Q. What, if anything, did Mr. Monaghan say in reply to that proposition you made him? A. He said he was anxious to have a representative in Chicago, and that they were in position to supply that quantity for that territory. Q. What did he say his company would do? A. He said they would set aside that quantity of cement for us, and was willing to make the arrangement with us at the price of one dollar and thirty cents per barrel. Q. Was there anything said at that time as to placing an exclusive agency with you? A. That was talked about. We wanted the exclusive agency for Chicago, for Illinois, southern Wisconsin, and—I have just forgotten, but there was southern Indiana and part of Michigan—the territory surrounding Chicago. Q. What did Mr. Monaghan say regarding an exclusive agency? A.

He said that was satisfactory, and he would give us that territory. Q. What was said, if anything, regarding his furnishing you the thirty-five thousand barrels of cement? A. He said they would accept the proposition, and would set aside the thirty-five thousand barrels of cement· for us at °one dollar and thirty cents."

He further testified that he made a memorandum of the agreement that was then made, which he produced, and was read in evidence. It is in these words:

"Can give you 35 thousand bbls. and option on same until May 1st at $1.15 in Mich. at $1.30 per bbl. in cloth and $1.35 in paper, F. O. B. Chic. rail until mill is ready to ship by water. If possible we will make price less when we begin loading from our dock. You can have exclusive territory for Chic., Ill., Northern Indiana & So. Wis. 6 thousand per mo. 6 mos. for 35,000. Payments to be made 20th mo. following del.· Bags to carried on account at 10 cents and settlements in lost or shtg at 5 cents each. Ship via Grand Trunk or Mich. Cent. Ry. Ind. 1.10 at mill, Ill. 1.10 at mill. Wis. 1.10 at mill, Mich. 1.15 at mill. J. J. Young, Agt, 130 Fort Indiana St., Rutland· Transit Co. To carry Alpena cement and store it at dock. Wisconsin Central Ry. at Dks can carry about 3 to 5 thousand barrels."

He again testified as to what took place on the occasion in question as follows:

"Q. Going back to your interview with Mr. Monaghan on April 9, 1902, where you asked for a contract for the exclusive agency and the twenty-five to thirty-five thousand barrels cement for that season, I will ask you what Mr. Monaghan replied to that proposition of yours? Mr. Humphrey: I object to that question, for the reason that the witness has already stated that conversation—what he says was the conversation between them. Q. Tell us just what Mr. Monaghan stated as near as you can remember it? A. I don't know as I can any further than I have given it. G. State what acceptance, if any, he made to your proposition? A. He said to make the minimum amount twenty-five thousand barrels and the maximum amount thirty-five thousand, and in making out the memorandum ne asked me if I thought we would like the thirty-five thousand barrels, and I said we would; that we would like twenty-five thousand barrels for use right in Chicago, and I then wrote it down there—twenty-five thousand and thirty-five thousand—on the memorandum at that time, and I figured that in taking the thirty-five thousand barrels it might be used in that way. Q. You may state what Mr. Monaghan said as to whether they would furnish the thirty-five thousand barrels? A. He said they would. Q. What did you say when he said they would furnish it? What did you say about taking it? A. I said we would take it, and start shipments on it immediately."

On cross-examination he testified as follows, to wit:

"X-Q. Do you then claim that a definite arrangement was made between you· and Mr. Monaghan? A. Yes, sir; I do. X-Q. Was that on the day you had a contract with him? A. Yes, sir."

And again:

"X-Q. Do you claim that on the 9th of April you bought thirty-five thousand barrels cement from the Alpena Portland Cement Company? A. Yes, sir. X-Q. And at that time did you become responsible to pay them for that amount of cement? A. Yes, sir; upon delivery, as ordered."

The witness Sullivan, who on April 9, 1902, was an employé of plaintiff, and who claimed to have heard a portion of the negotiations between Gray and Monaghan, testified on direct examination in part as follows, to wit:

"Q. What in particular did Mr. Monaghan propose for the sale of cement? A. Well, he spoke in the usual way of a man trying to sell cement, that he wanted to place a quantity of cement in this market, and that he was looking for an agency. Q. You may state whether he suggested the amount that he would be willing to furnish Jenkins & Reynolds Company during the year 1902? A. He wanted to place in this market fifty thousand barrels of cement. Q. You may state what Mr. Monaghan said his company would furnish cement for in Chicago—what his terms or prices would be? A. $1.30 per barrel in cloth sacks, the usual charge of ten cents additional for sacks. Q. What did Mr. Gray say in response to these suggestions or these propositions by Mr. Monaghan? A. He finally accepted the proposition. Q. Yes; I want you to tell me as nearly as you can remember what Mr. Gray said. A. Well, he of course tried very hard to get a lower price; just as to what his exact language, why I can't remember that now. Q. Well state what he said as nearly as you can remember? A. Well, he spoke about it being a new cement and not being known in the market, and that he could buy other cement for that price or lower. Q. Now, I will ask you whether at last Mr. Monaghan and Mr. Gray came to an agreement about this proposed sale of cement? A. They finally agreed on the price. Q. At what price did they agree upon? A. One dollar and thirty cents. Q. And on what amount did they agree, if you know? A. As near as I can recollect, the Alpena Company were to furnish Jenkins & Reynolds not less than thirty or thirty-five thousand barrels. Q. That is during the season of 1902? A. During the season of 1902. Q. You may state whether or not any writing was made at this interview by either Mr. Monaghan or Mr. Gray relating to this trade? A. Well, you know they had several interviews. Q. And were you present at several of the interviews? A. Yes. Q. At any of the interviews where you were present was there any writing made by either of them setting forth their agreement? A. Mr. Gray drew up a pencil memoranda of what he considered would cover the agreement, which he showed to me. Q. I will ask you whether he showed it to Mr. Monaghan? A. Yes. Q. What did Mr. Monaghan say about it, if anything? A. It seemed to be satisfactory to him. Q. Well, I asked what he said as near as you can remember? A. Well, he said that covered the ground. I don't remember his exact words, but that was my understanding, that Mr. Monaghan was perfectly satisfied with that arrangement; that he didn't have any objections to the wording of the agreement. Q. I will ask you to state as nearly as you can remember, what he finally said about this memoranda made by Mr. Gray? A. He said it was satisfactory."

On cross-examination he testified substantially to the same effect.

The letters referred to above are certain letters from plaintiff to defendant of dates April 15, 16, 23, and 24, 1902, a letter from defendant to plaintiff of date April 26, 1902, in answer to plaintiff's letter of the 24th, a letter from plaintiff to defendant of date April 28, 1902, and a letter from defendant to plaintiff of date May 5, 1902. They are as follows:

"Chicago, April 15, 1902.

"The Alpena Portland Cement Co., Alpena, Mich.—Gentlemen: We inclose herewith orders for five car loads of cement which we would kindly ask you to ship as soon as possible, as ordered. This is in compliance with verbal agreement with your Mr. Monaghan when in our office a few days ago, and which he was to have sent us in writing in a few days.

"Your prompt attention will oblige,

"Yours very truly,                          Jenkins & Reynolds Co.,
                                            "G. C. Gray, Treas."

"Chicago, April 16th, 1902.

"The Alpena Portland Cement Co., Alpena, Mich.—Gentlemen: Will you kindly obtain for us your lake and rail tariff and also all rail to points in

Indiana, Illinois, and southern Wisconsin, where we are at liberty to quote your cement? We should like to have this at the earliest moment possible, as we want to get out quotations now for the summer. Also please send us some of the literature pertaining to your cement which you spoke of recently.

"Yours very truly,                                Jenkins & Reynolds Co.,
                                                    "G. C. Gray, Treas."

"Chicago, April 23, 1902.

"Alpena Portland Cement Co., Alpena, Mich.—Gentlemen: Your book- let on Alpena cement is just received, and we congratulate you upon the neatness and thoroughness of the work. The book is very attractive, and we would like to have a number of them to distribute among prospective customers. If consistent, please send us a quantity by express, as we think it will aid in securing trade for your cement.

"Yours very truly,                                Jenkins & Reynolds Co.,
                                                    "G. C. Gray, Treas."

"Chicago, April 24th, 1902.

"Alpena Portland Cement Co., Alpena. Mich.—Gentlemen: On April 15th we sent you orders for five cars of cement, with instructions to ship as soon as possible, and since then only one car has been forwarded, nor have we received the letter from your Mr. Monaghan confirming our verbal agree- ment with your company for supplying us a quantity of cement. We pre- sume he is still out of town, but, as we are in position now to dispose of a good quantity of cement, we are anxious to have it settled, and know what we are to expect in the way of shipments from you. As soon as this is done, we will send you more orders. In the meantime we wish you would hurry along the four cars on our order.

"Your prompt attention will oblige,

"Yours very truly,                                Jenkins & Reynolds Co.,
                                                    "G. C. Gray, Treas."

"Alpena. Mich., April 26, 1902.

"Jenkins & Reynolds Co., Chicago, Ill.—Gentlemen: Replying to your favor of April 24th, would say that we entered your orders for five car loads, as stated, to go forward at once. Our orders are crowding us, so that we find it difficult to ship promptly to our customers, but we expect to get these cars off to-night and thus complete this order. The writer has delayed writing to you in accordance with the understanding we had when in your city for the reason above stated, that we are crowded with orders for cement, and that we would have difficulty in filling your orders for large quantities, and this would result in disappointment to yourselves and cus- tomers. We shall be able to do better in the future we expect. as a new addition to our factory will be put in operation within the next week, which will increase our capacity, and will then take up the question of agency in the territory discussed. Until then we are

"Very respectfully yours,                The Alpena Portland Cement Co.
                                                    "Per John Monaghan."

"Chicago, April 28, 1902.

"Alpena Portland Cement Co., Alpena, Mich.—Gentlemen: Your favor of the 26th inst. is at hand. We are somewhat surprised that we have not yet received more invoices from you on the five cars of cement ordered, when you know we are doing all we can to get your cement introduced in this market; but, if it has been impossible for you to do so, we cannot blame you, and would kindly ask you to rush the balance along as quickly as possible, and as soon as we know what we can depend upon we will send you more orders. We have nearly enough contracts to cover the minimum amount of 25,000 barrels set aside for us when you were here. If we can only get the cement regularly to both our old yard and our new north side yard we feel that we can represent you satisfactorily in

every way. Please let us know what we can expect in the way of prompt shipments on our future orders by return mail, and oblige
    "Yours very truly,                    Jenkins & Reynolds Co.,
                                              "G. C. Gray, Treas."

                                         "Alpena. Mich., May 5th, 1902.
    "Jenkins & Reynolds Co., Chicago. Ill.—Gentlemen: Your favor of April 28th came during the writer's absence, and has just reached his hands. We have heretofore explained to you the cause of the delay in our shipments, and the situation in this regard is in no way improved, for we are swamped with orders for immediate delivery, and we are trying the best way we can to keep our customers supplied. We note what you say in regard to the 25,000 barrels of cement. We did not mean in our conversation in Chicago to be understood that 25,000 barrels of cement were to be set aside subject to your orders. That quantity was spoken of in reference to our agency, but we do not see our way clear to appointing an agent for your city,' as we much fear that we would be unable to supply his needs throughout this season; therefore, we desire to say that we could not agree to let you have 25,000 barels or any definite quantity at the present writing. We make this statement now, so that you will not be in the future disappointed should we find ourselves unable to ship your orders promptly.
    "Respectfully yours,                  The Alpena Portland Cement Co.,
                                              "Per John Monaghan."

The orders inclosed with the letter of April 15th were just such orders as would have been sent had there been a previous understanding in pursuance to which they were sent, and they were filled by shipments made April 19th and 30th and May 1st. In the letter of April 15th reference is made to "the verbal agreement with your Mr. Monaghan when in our office a few days ago"; in the letter of April 16th request is made for freight rates to points in Indiana, Illinois, and southern Wisconsin, and for literature pertaining to defendant's cement, for the reason that plaintiff wanted to get out quotations then for the summer, and the points to which freight rates are desired are referred to as points "where we are at liberty to quote your cement"; in the letter of April 23d receipt of a book on Alpena cement is acknowledged, and a desire for a number of them is expressed, in order "to distribute among prospective customers"; in the letter of April 24th it is noted that a letter from Mr. Monaghan had not been received, "confirming our verbal agreement with your company for supplying us a quantity of cement"; and in the letter of April 28th the statement is made that plaintiff had "nearly enough contracts to cover the minimum amount of 25,000 barrels set aside for us when you were here."

Such, then, is the evidence that was introduced favoring plaintiff's position that what took place on April 9th was something more than the giving of an option by defendant. Possibly there was other evidence introduced of like character. By directing attention to this much thereof we would not be understood as negativing the existence of such other evidence, though we hardly think there was. This much, however, is sufficient for our purpose. The witness Gray testified positively in that portion of his testimony quoted that an absolute agreement was entered into on the occasion in question for the purchase of defendant's cement. It is questionable what effect should

be given to his testimony as to the quantity purchased. Counsel for plaintiff in error contends that its true meaning is that 35,000 barrels were then purchased, the understanding first being that 25,000 barrels were purchased, and an option given on 10,000 barrels additional, which option was exercised before the transaction closed. It certainly goes to the extent that at least 25,000 barrels were then purchased, and an option given on 10,000 barrels additional. The witness Sullivan corroborated Gray as to an absolute agreement having been made, and there is room to claim that such was the effect of the letters introduced, with a certain exception perhaps to be hereafter noted. The attitude in which they present plaintiff is that of one who thought and claimed that he had an agreement with defendant that was something more than a mere option. Each of them presupposes that plaintiff has such an agreement, and in the first, fourth, and last ones express reference is made thereto. The correctness of this attitude of plaintiff was not controverted or questioned by defendant until May 5th, 20 days after plaintiff's first letter, in which reference is made to a verbal agreement with Monaghan, and a week after its last letter, in which reference is made to the fact that thereby 25,000 barrels as a minimum were set aside for plaintiff, and the orders for five car loads of cement inclosed with the first letter, which were said to be sent in compliance with verbal agreement, were filled. It may be said, however, that the defendant's letter of April 26th indicates that defendant regarded that matters were still open between it and plaintiff. The exception heretofore referred to is the references in plaintiff's letters of April 15th and 24th to putting the verbal agreement in writing, the effect of which will be considered when we come to take up the other branch of defendant's contention as to its not being under contract with plaintiff.

Before, however, concluding as to the positive character of this evidence, certain matters should be considered which may be thought to affect its substantiality. One is the reference in the memorandum to an option until May 1st, of which much is made by counsel for defendant in error. Gray's testimony was that this memorandum was a memorandum of the agreement that was had on April 9th. On direct examination he testified as follows:

"Q. At the time of this proposition or conversation, did you make any memorandum of the agreement? A. I did. Q. I show you three small sheets, and ask you whether this is the original memorandum you made at that time? A.. They are. Q. When you made this memorandum, what did you do with it after you made it out? A. I handed it to Mr. Monaghan. Q. What did he say to it? A. He said it was correct."

On cross-examination he testified as follows:

"X-Q. Where was Mr. Monaghan when you showed him this memorandum? A. Right there by my desk. X-Q. Did you hand it to him to read, or did you read it over to him? A. I read it to him. X-Q. Did he have it in his hands? A. I could not say positively as to that. X-Q. Now, you intended at the time did you not, Mr. Gray, that your understanding by the talk between you was embodied in what was written right there? A. Yes, sir. X-Q. And you intended that whatever your understanding was from what Mr. Monaghan has said to you was contained in this memorandum, didn't you? A. Yes, sir; this is what we talked about. X-Q. And there

was no different or other arrangement made between you except what is stated in there, was there? A. There may have been. That was simply drawn to cover what we talked about. Technically, it is just what was said. X-Q. It is the idea that you got of what he was trying to arrive at at that time? A. Yes, sir."

The memorandum itself, however, hardly bears out the idea that it was a memorandum of an agreement then made. It does not wear the aspect of such a memorandum. It seems on its face to be a memorandum of a proposition from defendant, i. e. that is what it was intended to be when made. The fact that such was the case is not inconsistent with an agreement having been made on that occasion. It is possible for a memorandum of defendant's proposition to have been made, and then for an agreement to have been reached on the basis of such proposition. Indeed, this view of the matter possibly can be reconciled with Gray's testimony that the memorandum was a memorandum of the agreement. The understanding may have been that reference should be had to the memorandum for certain, at least, of the terms of the agreement; but, whether so or not, reference could properly be had to it for that purpose, as the memorandum was a part of the transaction which it is claimed resulted in an absolute agreement. One not overly accurate in his statements might, therefore, speak of it as a memorandum of the agreement. If, then, such is the true relation of the memorandum to the transaction, i. e. when made it was simply a memorandum of defendant's proposition, the reference therein made to an option until May 1st is relieved somewhat at least of any injurious effect it may otherwise have on plaintiff's position that an absolute agreement was reached on April 9th. If, however, strictly speaking. it was a memorandum of the terms of the agreement that was then had, it gives some color to defendant's contention that that agreement was not an absolute one, but an agreement for an option only. Defendant's counsel in cross-examining Gray treated the memorandum as, strictly speaking, a memorandum of the terms of the agreement, and questioned him as to how he reconciled the memorandum with his testimony that an absolute agreement was then made. The questions and his answers thereto were as follows:

"X-Q. What do you mean, then, in this memorandum of yours of the talk between you that you had an option on thirty-five thousand barrels and an option on same until May 1st? A. That was twenty-five thousand barrels bought and option on thirty-five thousand. X-Q. What do you mean by option? A. I mean that we could take twenty-five thousand barrels and option on thirty-five thousand. X-Q. Did you write in your option 'can you give thirty-five thousand barrels and option on same until May 1st'? What do you mean, that they gave you an option until May 1st on that? A. No, sir. X-Q. What do you mean? A. Gave us an option on the thirty-five thousand barrels. X-Q. Now you took an option on the thirty-five thousand barrels of cement? A. No, sir. X-Q. This memorandum was made by you at the time, was it? A. Yes, sir. X-Q. And you now claim that you made the memorandum according to your talk? A. Yes, sir. X-Q. Now, your memorandum reads like this: 'Can give you thirty-five thousand barrels and option on same until May 1st, giving price at $1.30 per barrel in cloth and $1.35 in paper,' etc. Now what you meant was an option until May 1st, didn't you? A. No, sir. X-Q. What do you claim you had an option on? A. Thirty-five thousand barrels. X-Q. An option, did you say, to buy same? A. Yes, sir. X-Q. But you claim that you did buy twenty-five thousand barrels and option on ten

thousand more barrels? A. Yes, sir. X-Q. Now, where is there anything in this memorandum which shows that you were to buy twenty-five thousand barrels and have an option on ten thousand barrels more? A. That does not show all that we talked about. X-Q. Does not this memorandum outline the correct understanding between you, and as you say it was presented to Mr. Monaghan? A. I read it over to him. X-Q. Then the correct understanding was that you had an option on thirty-five thousand barrels, as mentioned in the memorandum, was it not? A. No, sir. X-Q. Mr. Gray, did you ever see or talk with Mr. Monaghan after that until you met him in Detroit? A. No, sir; not to my recollection. X-Q. Whatever you did with reference to that option on thirty-five thousand barrels was done in writing, was it not? A. Yes, sir; I guess so. X-Q. If there was any acceptance of that option by you it was not verbal, was it? A. No, sir."

The effect of this testimony is not entirely free from doubt. Possibly it is this: That the agreement that was had on April 9th was that plaintiff bought 25,000 barrels of cement on that occasion, and was to have an option on 10,000 barrels additional, making 35,000 barrels in all, and it is this option to which reference is had in the memorandum. Possibly the effect of said witness' testimony as to the nature of that agreement heretofore quoted is the same. And the statement in the letter of April 28th that "we have nearly enough contracts to cover the minimum amount of 25,000 barrels set aside for us when you were here" coincides with this testimony, if such is its true effect. Counsel for plaintiff in error maintains, however, that the effect of Gray's testimony here as in the quotation heretofore made therefrom is that plaintiff accepted the option as to the 10,000 barrels on that occasion, and hence then closed the contract for the whole 35,000 barrels, and he fits this with the memorandum in this way. The statement in the memorandum, "Can give you 35,000 bbls. & option on same until May 1st," has reference to the agreement as it stood before the acceptance of the option as to the 10,000 barrels, and the succeeding statement, "you can have exclusive territory for Chic., Ill., Northern Ind. & So. Wis. 6 thousand per mo. 6 mos. for 35 thousand" had reference to it as it stood after that option was accepted. This position is open to the suggestion that it is farfetched, and the position that the option to which reference is had in the memorandum is the option as to the additional 10,000 barrels to make up 35,000 barrels in all does not fit closely the language of the memorandum. Apparently the option to which reference is had is an option on the whole 35,000 barrels. So it is that the only position which makes Gray's testimony entirely consistent with the memorandum is that heretofore suggested. The memorandum is a memorandum of a proposition by defendant, as it appears to be, on the basis of which the agreement was made, and not of the actual agreement itself.

Another matter to be here considered is a portion of said Gray's testimony on cross-examination, the effect of which is claimed to be that no binding agreement was reached on the occasion in question, and that all that took place was for defendant to give plaintiff an option. That portion of his testimony is as follows:

"Q. Up to the time you received that letter, May 5, 1902, had you in any way or form accepted the proposition contained in your memorandum for the twenty-five thousand barrels of cement, giving you an option on same

until May 1st?  A. Up to what time?  Q. Had you up to May 5th accepted your option, according to your memorandum, for the thirty-five thousand barrels of cement?  A. We sent the order of April 15th.  Q. This is the order for five car loads.  Is that the only way you accepted it?  A. This is the only way, and accepted in the letter sent with the orders.  Q. You know of no other way except the ordering of these five car loads with the letter you sent with the orders?  A. We sent that letter I know.  I don't remember of any other way now.  Q. And if you ever accepted your option it was by this letter of April 15th, and your three orders for five car loads cement?  A. Yes, sir.  Q. And that is the only acceptance of that option you ever made?  A. I don't say positively.  Q. You don't know of any other?  A. I would not want to say until I go through the correspondence.  Q. That is all you remember of now in this correspondence?  A. We were waiting the return of Mr. Monaghan to Alpena.  Q. And if there is any other acceptance of the option on the thirty-five thousand barrels cement it is contained in the correspondence since April 9th?  A. In the correspondence; yes, sir. Q. Somewhere in it since April 9th?  A. Yes, sir.  Q. And you made no acceptance unless it is contained in the correspondence?  A. No, sir."

But in view of the rest of said witness' testimony heretofore quoted, though the option here referred to is an option on 35,000 barrels, there is room to claim that the option really referred to is one on 10,000 barrels, which if accepted would bring the whole amount purchased up to 35,000 barrels.

Still another matter to be here considered is that, though the witness Gray testified on direct examination, as heretofore quoted, that the contract included an exclusive agency, he stated differently on cross-examination.  He had been asked about a letter written by him on behalf of plaintiff on May 10th, in which he stated that on the occasion in question they "came to a positive understanding that we were to have the sole agency for your cement for Illinois, northern Indiana, and southern Wisconsin."  He was then asked and testified as follows:

"X-Q. Did you at the time you wrote that letter on May 10th understand that your contract with Mr. Monaghan was that you had obtained the sole agency for the Alpena Portland Cement in Chicago?  A. No, sir. X-Q. If you did not understand it that way, why did you say so?  A. That according to our talk, we were to have it after they settled up with the Golden City Cement people.  X-Q. Didn't you say that you entered into a positive understanding, and that you were to have the sole agency of their cement for Illinois, northern Indiana, and southern Wisconsin, and that you had made such arrangement with Mr. Monaghan when he was at your place there in Chicago?  A. It was to be formed later.  That was the order that he took for twenty-five thousand barrels, and an option on ten thousand barrels additional."

We are now in position to reach a conclusion as to the positive character of the evidence that was introduced favoring plaintiff's position than an agreement was come to on April 9th that was more than a mere option to purchase a certain quantity of cement.  Leaving out of consideration the qualifying matters referred to, there would seem to be no room for question but that it was substantial, if, indeed, it was not sufficient, with nothing to the contrary to require a finding in accordance with that position.  Gray testified positively that an absolute agreement was then entered into.  He was corroborated by Sullivan, and, to a certain extent, at least, by what transpired after April 9th down to May 5th.

Then, as to the effect of said qualifying matters. While perhaps, a witness may so testify in part of his examination as to annul and destroy what he may have testified in another part thereof in favor of the party in whose behalf he was introduced, such was not the case here. Those qualifying matters referred to did not affect the substantial character of that part of Gray's testimony favoring plaintiff's said position. Possibly a view of them can be taken consistent therewith. At any rate, it cannot be said that all reasonable men would regard them as overthrowing said testimony. It was for the jury to consider them, and determine just what effect should be given to them. In the case of Milwaukee Mechanics' Ins. Co. v. B. S. Rhea & Son, 123 Fed. 9, 60 C. C. A. 103, this court held that the question as to whether an agreement between the parties thereto was an absolute sale or only an option was one for the jury, though it was much impressed with the theory that it was a mere option.

What, then, is the showing made by the evidence as to whether or not on the occasion in question the parties hereto, acting through their respective agents, postponed the conclusion of a contract till the terms then agreed upon should be embodied in a written instrument signed by both parties. It would seem to be certain from the evidence introduced that the parties contemplated that the terms then agreed on should be so embodied. In plaintiff's letter of April 15th it is said that Monaghan was to send the verbal agreement in writing to plaintiff in a few days, and in the letter of April 24th it is noted that the letter from Monaghan, "confirming our verbal agreement with your company for supplying us a quantity of cement," had not been received. The witness Gray testified on direct examination that when Monaghan left Chicago on April 9th he stated that he was going up into Wisconsin, and would be gone four or five days, and as soon as he returned to Alpena the arrangement would be put in writing. On cross-examination he testified as follows:

"X-Q. Do I understand you now that you did not close a contract completely on the 9th day of April? A. No; I didn't say it was closed; it was not signed; it was so far as we were concerned. X-Q. No contract was made at all on the 9th of April was there? A. Yes, sir. X-Q. Didn't you testify on your direct examination that Mr. Monaghan when he got back to Alpena was to write out the contract and have it signed by you both? A. The firm he represented; yes, sir. X-Q. That was to make the contract between you, was it not? A. No, sir; it was all agreed upon right there in our office, but he wanted to wait until he got back to Alpena to have it written out, so he could use the letter paper of the firm, and it was to be just what we had talked there. X-Q. He would put it in writing? A. Yes, sir."

And again:

"X-Q. Why didn't you ask of Monaghan to put it in writing, so it would be settled between you? A. We did, and he said he would as soon as he returned to Alpena. X-Q. Why did you ask him to have it put in writing, so it would be settled between you? A. Because it is customary to have such matters put in writing. X-Q. And until the matter was put in writing it was not settled, was it? A. Yes, sir; it was; we considered it so."

And again:

"X-Q. Mr. Gray, Mr. Monaghan when he was there in Chicago said to you, did he not, that he would have to refer this matter to the Alpena Portland Cement Company of Alpena—this talk of yours—did he not? A. He

said we would talk it over with them. X-Q. And after talking it over with them he would write up a memorandum of agreement, and send it to you for signature? A. Yes, sir; going to send it on. X-Q. Then, after taking it up with them, would draw it up and send it on to you? A. It was to be fixed after he got back to Alpena. X-Q. And whatever was talked between you two, and that talk was that the contract would be made and signed and sent to you for your signature? A. No, sir. X-Q. What was to be done? A. You see the contract was all made, and was to be drawn up by him after he went back to Alpena."

And again:

"X-Q. Did you not hear him say at that time that he would have to submit it to his company for confirmation? A. I knew that it would get back to them. X-Q. You know that he told you that he would have to submit it to his company for confirmation, don't you? A. I presume he said he would have to refer it to them. X-Q. That he would have to refer it to them for confirmation? A. No, sir. X-Q. Didn't he tell you that? A. No, sir; not that I remember. X-Q. What did you say about referring it? A. He said after he got back that it would be confirmed in writing. X-Q. Then he would answer you in writing if they confirmed it? A. That is, the acceptance of it."

And on redirect examination he testified as follows:

"R. D. Q. I will ask you whether Mr. Monaghan on April 9th, when you and he entered into certain arrangements as you have described, whether he said anything to you 'to the effect that he would have to report back to the company to get its approval of these arrangements? A. He said this would be put in writing when he got back to Alpena. R. D. Q. I will ask you whether he said to you that the arrangement between him and you would have to be submitted to his company for approval? A. No, sir; he said it would be put in writing when he got back home. R. D. Q. The question is, did he say that or anything to that effect? A. No, sir; he did not say it."

The witness Sullivan on direct examination testified as follows:

"Q. I will ask you. Mr. Sullivan, whether anything was said by Mr. Monaghan about reducing this pencil memoranda to writing? A. Well, yes; it was to be put in writing. This, as I understand it, was just simply a rough draft of the contract."

And upon cross-examination as follows:

"X-Q. Now, I understand you to testify on direct examination that when this was drawn up by Mr. Gray that the understanding between Mr. Gray and Mr. Monaghan was that the contract was to be put in writing? A. That was my understanding. X-Q. And, of course, if it was to be put in writing, it was to be signed by the parties, wasn't it? A. I presume so."

And in a letter written by plaintiff to defendant on May 10th, after the parties were at issue, introduced in evidence, occurs this statement:

"This understanding would have been put in writing when Mr. Monaghan was here, but he did not do so, stating that he preferred to put it on your own letterhead after he returned to Alpena."

This was the entire evidence on this matter. Now, it is well settled that though the parties to a verbal agreement contemplate that it is to be reduced to writing and signed, yet if the understanding is that this is to be done simply as a memorial of the agreement it is binding, notwithstanding it is never put to writing. In the case of Pratt v. Railroad Co., 21 N. Y. 308, Judge Selden said:

"A contract to make and execute a certain written agreement, the terms of which are mutually understood and agreed upon, is in all respects as valid and obligatory, where no statutory objection interposes, as the written contract itself would be if executed. If; therefore, it should appear that the minds of the parties had met; that a proposition for a contract had been made by one party and accepted by the other; that the terms of the contract were in all respects definitely understood and agreed upon; and that a part of the mutual understanding was that a written contract embodying these terms should be drawn and executed by the respective parties—this is an obligatory contract, which neither party is at liberty to refuse to perform."

And Judge Cofer in the case of Bell v. Offut, 10 Bush, 632, said:

"If two persons enter into a verbal agreement about a matter as to which an enforceable parol contract can be made. it would be no defense when one of them is sued for a breach of the contract that he understood it would not be obligatory unless reduced to writing; nor does a contemporaneous agreement to reduce a contract to writing make its validity depend upon its being actually reduced to writing and signed. The agreement to put in writing amounts .to no more than an agreement by the parties to provide a particular kind of evidence of the terms of their contract. and no more prevents its enforcement upon other legal evidence than 'an agreement that they would go to a named individual and state to him the terms of their contract would render the testimony of any other competent witness inadmissible to prove what the contract was."

If, however, the understanding is that there is to be no contract until the agreement is reduced to writing and signed, of course there is none until that event happens. The cases in which the question has arisen as to whether the reduction of the agreement to writing and its signing is simply as a memorial thereof or as a conclusion of a contract are quite numerous. In some it has been held to be as a memorial thereof, and in others as a conclusion of the contract. We do not find it necessary to generalize them. Quite a collection of the American decisions are cited in the notes to Williston's Wald's Pollock on Contracts, pp. 46, 47. In the case of Mississippi, etc., S. S. Co. v. Swift, 86 Me. 248, 29 Atl. 1063, 41 Am. St. Rep. 545, Judge Emery surveys the authorities, and thus concludes:

"From these expressions of courts and jurists it is quite clear, after all, the question is mainly one of intention. If the party sought to be charged intended to close a contract prior to the formal signing of a written draft. or if he signified such an intention to the other party, he will be bound by the contract actually made, though the signing of the written draft be omitted. If, on the other hand, such party neither had nor signified such an intention to close the contract until it was fully expressed in a written instrument and attested by signature, then he will not be bound until the signatures are affixed. The expression of the idea may be attempted in other words. If the written draft is viewed by the parties merely as a convenient memorial or record of their previous contract, its absence does not affect the binding force of the contract. If, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed."

As to what circumstances will help in determining how the matter was viewed in any particular case, he said:

"In determining which view is entertained in any particular case, several circumstances may be helpful, as whether the contract is of that class which are usually found to be in writing; whether it is of such nature as to need a formal writing for its full expression; whether it has few or many details;

whether the amount is large or small; whether it is a common or unusual contract; whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations. If a written draft is proposed, suggested, or referred to during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract."

And as to whether it is a matter always of easy solution he said:

"Still, with the aid of all rules and suggestions, the solution of the question is often difficult, doubtful, and sometimes unsatisfactory. An illustration of this is in the case of Rossiter v. Miller, above quoted from. In that case Lord Chief Justice Coleridge and Lord Justices James and Baggallay, three of England's most distinguished judges, were clear that there was no contract for want of formal draft. Lord Chancellor Cairns and Lords Hatherley, Blackburn, and Gordon, equally able and eminent jurists, were confident in the contrary opinion."

Pollock on Contracts (Williston's Wald's Ed.) p. 48, puts the matter this way:

"The tendency of recent authorities is to discourage all attempts to lay down any fixed rule or canon as governing these cases. The question may, however, be made clearer by putting it in this way—whether there is in the particular case a final consent of the parties, such that no new terms or variations can be introduced in the formal document to be prepared."

Here, according to Gray's testimony, every possible detail of the contract was agreed upon. Nothing was left open to be thereafter determined, and a memorandum was made by him, and inspected and accepted as correct by Monaghan, if not of the terms of the agreement, of the defendant's proposition upon which the agreement was based. The evidence tends to show that the reduction of the agreement to writing was contemplated as a memorial thereof, and not as the conclusion of a contract. Point is made of the fact that in the letter of April 24th reference is made to the nonreceipt of a letter from Monaghan confirming the verbal agreement, and anxiety is expressed to have matters settled, so that it might know what to expect in the way of shipments. This is not inconsistent with the understanding having been that the reduction of the agreement to writing was for the purpose of having a memorial thereof. If such was the case, until it was reduced to writing matters would be unsettled, and cause for anxiety would exist. At any rate, it certainly cannot be said that all reasonable men would conclude that the meaning of the parties was that the agreement was not binding in law until it was put into writing. Just what the meaning and intention of the parties in regard to the agreement being put into writing was, was a question for the jury under proper instructions. The case of Ambler v. Whipple, 20 Wall. 546, 22 L. Ed. 403, has been relied on as requiring a contrary position. But it does not. There a contract in writing had been prepared and signed by Whipple and then delivered to Ambler, who promised to sign it, but did not. Mr. Justice Miller said:

"It is very clear that both parties intended to have a written instrument signed by each as the evidence of any contract they might make on that subject, and neither considered any contract concluded until it was fully executed. Under these circumstances, Ambler had a right to decline to sign the paper, and until he signed he was not bound by it. It was not

drawn by him, nor at his dictation. It was first signed by Whipple, and drawn up by him or in his presence, and made to suit his purposes. It is idle to say that because Ambler took a copy of it from Martin to examine he became a party to it, though he never signed it."

In view of the foregoing considerations, we feel constrained to hold that there was substantial evidence favoring plaintiff's position that on the occasion in question a contract was concluded between plaintiff and defendant, assuming Monaghan to have had authority to make it on the latter's behalf. In reaching this conclusion, we have left to one side matters appearing in the evidence which are relied on by defendant as opposing or conflicting with this substantial evidence. They are such matters as these: A letter from plaintiff to defendant, dated April 11th, asking quotation of price on 1,000 barrels of cement delivered at Wooster, Ohio, and about 7,000 barrels delivered at Connersville, Ind. This is thought to be inconsistent with plaintiff's having purchased 35,000 or even 25,000 barrels of cement on the 9th. Again, after defendant by his letter of May 5th notified plaintiff that it would not ship cement under its claim of a contract, plaintiff at various times gave orders for shipment of cement amounting in all to 35,000 barrels. Those orders were dated, respectively, May 10th, July 8th, July 23d, August 14th, September 23d, and October 23d. And on December 31st plaintiff rendered a statement to defendant of the amount of its account for damages for breach of contract. In each of these orders it is stated that it is to apply "on our contract with you of April 15th." And in the letter accompanying the statement the contract is referred to as "dated April 15, 1902." On cross-examination the witness Gray attempted an explanation of how in these orders and in this letter the contract was stated to have been made on April 15th, when according to his testimony it was really made on the 9th. In addition to these matters, there was a letter from Monaghan to defendant, written from Chicago on April 9th, in which no allusion is made to a contract with plaintiff, and testimony of various dealings of Monaghan in Chicago at this time in regard to cement, which are thought to be inconsistent with the view that a contract had been concluded with plaintiff on the occasion referred to. Possibly there are other matters which are also relied on by defendant; but all these matters, so far as admissible in evidence, were for the jury in determining whether in fact any contract was then concluded.

Then, as to whether Monaghan had authority to make a contract with plaintiff. His position with defendant was that of chief salesman. In February and March, before the contract is claimed to have been made, on different occasions plaintiff wrote to defendant for prices upon 5,000 to 10,000 barrels of cement delivered at Chicago, 1,500 to 2,000 barrels at Milwaukee, 1,000 barrels at Grand Rapids, and 2,500 barrels at Battle Creek, and in each instance defendant answered through Monaghan, offering to sell the quantity of cement wanted at certain prices. Evidence was introduced of Monaghan's making divers sales of cement on defendant's behalf in the years 1901, 1902, and 1903, ranging from 2,000 to 7,500 barrels. There can

be no question that he had authority to sell cement for defendant, and to enter into contract with reference thereto. That was what he was employed to do. It does not seem to be contended that he did not have such authority. Point is made solely of the fact that in this instance he is claimed to have sold a very large quantity of cement. But there was no evidence that there was any limitation upon his authority to sell as to the amount sold, much less that plaintiff was aware of any such limitation. It must be held that, in the absence of such limitation and of plaintiff's being chargeable with notice thereof, that Monaghan did have authority to make the contract.

It is to be noted that no question is made with reference to the statute of frauds. The alleged contract was made in Illinois, and is governed by the law of that state. An oral contract of the character claimed herein is not in violation of the statute of frauds thereof.

The judgment of the lower court is reversed, and the cause is remanded to the lower court for proceedings consistent herewith.