MILWAUKEE MECHANICS' INS. CO. OF MILWAUKEE, WIS., v. B. S.
RHEA & SON et al.

(Circuit Court of Appeals, Sixth Circuit.  June 2, 1903.)

No. 1,144.

1. INSURANCE—OWNERSHIP OF PROPERTY—PURCHASER IN POSSESSION UNDER
ORAL CONTRACT.

A vendee, in possession of property under a parol agreement by which
he unconditionally bound himself to buy and pay for the property, is
the "sole and unconditional owner," within the meaning of that term as
used in fire insurance policies, and may truthfully represent himself as
such in an application therefor.

2. DIRECTION OF VERDICT—CONSIDERATION OF EVIDENCE.

On a motion to direct a verdict, in determining the question whether
there is any sufficient evidence, if credited by the jury, to justify a ver-
dict in favor of the other party, the court is required to take that view
of the evidence and of the inferences which may be drawn therefrom
most favorable to the party against whom the instruction is asked.

In Error to the Circuit Court of the United States for the Middle
District of Tennessee.

This was an action upon a policy of fire insurance, brought by B. S. Rhea
& Son, a copartnership, for the use of two national banks named in the writ.
The insured premises were destroyed by fire in November, 1899, and during
the currency of the policy, and this action was brought to recover the full
amount of the insurance.  The policy on its face provided, among other
things, that it should be void "if the interest of the insured in the property
be not truly stated herein,  *  *  *  or if the interest of the insured be other
than unconditional and sole ownership."  The insurance company, among
other defenses not now necessary to be noticed, denied all liability upon the
ground that the insured had not truly stated their interest in the insured
property and had no insurable interest whatever.

The plaintiffs below were forwarding and storage merchants, owning and
operating an elevator and warehouse on the east bank of the Cumberland
river at Nashville.  In the spring of 1893 they became financially embar-
rassed, and voluntarily made a distribution of all their assets among their
creditors in full payment and satisfaction.  Among their creditors so settled
with were the First and American National Banks at Nashville.  These banks
received certain stocks and choses in action in satisfaction of a part of their
several debts, and accepted a deed to the insured premises as tenants in
common as payment and satisfaction of an additional indebtedness aggregat-
ing $20,000.  Of this, $15,000 was owing to the American National Bank, and
$5,000 to the First National Bank, so that the first-named bank became the
owner of an undivided three-fourths interest in said elevator or warehouse,
and the other bank of an undivided one-fourth.  Thus the matter stood until
the fall of 1893, when it is claimed that these two banks sold back to B. S.
Rhea & Son all of the property which they had received in the spring, and
that, although no reconveyance of the warehouse was made, B. S. Rhea &
Son became, by virtue of the contract then made, revested with such an
interest in the warehouse as was insurable, and such as to constitute them
the sole and unconditional owners within the meaning of the contract of in-
surance.  Rhea & Son continued in possession, and in May, 1899, took out
the policy in suit, wherein they are named as the insured and as owners.
The insured property is described therein as situated upon leased premises,
and the loss is made "payable to the American National Bank, mortgagees,
as their interest may appear."  There was evidence tending to show that the
First National Bank was also included as a mortgagee in the loss payable

¶ 1. See Insurance, vol. 28, Cent. Dig. §§ 347, 618.

clause, and by mistake of the local agent of the insurer accidentally omitted. At the close of all of the evidence the defendant below moved the court to instruct the jury to find a verdict in its favor. This was denied, and exception reserved.

After instructing the jury that the policy would be void if Rhea & Son were not the owners of the property insured at the date of the policy, the trial judge instructed them as follows: "That notwithstanding the record legal title was in the American National Bank and the First National Bank, three-fourths in one, and one-fourth in the other, if there was a completed agreement, verbal or written, between them and Mr. Rhea, by which Mr. Rhea was to have the property back on terms stated, and the property was sufficiently described to be identified, that he was to pay interest annually on the debt for which the property had been transferred, and pay insurance, taxes, repairs, and finally, when the property could be paid for, title made to it, if he was a vendee under a contract like that in possession, he would be, and might represent himself as being, the owner, and the policy would be valid, in the absence of any fraud, and assuming that he was acting in good faith. Under such circumstances as that, the relation between him and the banks would be that they would be the legal owners, and Rhea would be the equitable owner, and, in the absence of a particular inquiry as to whether his interest was legal or equitable, he might consider himself the true owner under such a contract, and might so state, and insure the property for himself and the banks. If you find the existence of such a contract as that, the policy would not be forfeited on account of the fact that he did not have the record paper title; and that is the question of fact which I submit to you for your determination." The jury were directed to specially find whether there was a verbal or written contract for the repurchase of the premises. In response to this the jury did, in addition to a general verdict for the plaintiff, return a special verdict in these words: "And the jury, upon their oaths aforesaid, do further say that they find that there was a verbal contract between B. S. Rhea & Son and the American and First National Banks, and also a written contract with the American National Bank, for the sale of the warehouse to said Rhea."

John Vertrees, William Vertrees, and Norman Farrell, Jr., for plaintiff in error.

John M. Gaut and James S. Pilcher, for defendants in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement, delivered the opinion of the court.

The defendants excepted to the instruction that a verbal contract of sale would constitute Rhea & Son the owners of the insured premises within the provisions of the policy. Inasmuch as the jury found specially that there was a written agreement between the American National Bank and Rhea & Son for the sale and purchase of the insured premises, the charge in respect to the effect of a parol agreement would be harmless, even if erroneous, but for the fact that the First National Bank was the owner of an undivided one-fourth interest, and unless the verbal agreement, which the jury found to exist between Rhea & Son and that bank, operated to make Rhea & Son the equitable owner of this one-fourth interest, the insured would not be the sole and unconditional owner of the premises described and insured. That a vendee in possession under a written agreement for the sale and purchase of the property is the equitable owner thereof, and authorized to represent himself as the owner, or the "sole and unconditional" owner, within the meaning of that term in fire policies, is hardly the subject of debate. 13 Am. & Eng. Ency. of

Law (2d Ed.) 178, 179, and cases cited; Insurance Co. v. Crockett, 7 Lea, 725. If the vendees unconditionally bound themselves to buy and pay for the property in question, they were in every equitable sense the owners, and a loss of the property by fire would fall upon them, and not the vendor. In Paine v. Miller, 6 Ves. Jr. 349, where an agreement for the sale and purchase of improved property was enforced after the destruction of the improvements by fire, and before title passed or possession changed, Lord Eldon said:

"If the party by the contract has become in equity the owner of the premises, they are his to all intents and purposes. They are vendible as his, chargeable as his, capable of being incumbered as his. They may be devised as his, they may be assets, and they would descend to his heir."

The rule is the same under a representation of ownership in a fire policy, whether the vendee be in possession under an oral or a written unconditional contract of purchase. If he has unconditionally agreed to buy, and the vendor to sell, upon definite terms, he is the sole and unconditional owner, within the meaning of that term in fire policies. 13 Am. & Eng. Ency. of Law (2d Ed.) 178, 179, and cases cited; Hough v. City Fire Ins. Co., 29 Conn. 10, 76 Am. Dec. 587; Rumsey v. Phœnix Ins. Co. (C. C.) 1 Fed. 396; Amsinck v. American Ins. Co., 129 Mass. 185; Wainer v. Milford Fire Ins. Co., 153 Mass. 335, 26 N. E. 877, 11 L. R. A. 598; Redfield v. The Holland Ins. Co., 56 N. Y. 354, 15 Am. Rep. 424; Pelton v. Westchester Ins. Co., 77 N. Y. 605; Dupuy v. Delaware Ins. Co. (C. C.) 63 Fed. 680.

In some courts, the ground upon which such a parol vendee in possession is held to be the equitable owner is that the contract is capable of enforcement, there having been a part performance. In still others, such a vendee is regarded as having an insurable interest, whether the contract be an enforceable one or not. In still other courts, such a vendee has been regarded as the equitable owner, irrespective of the doctrine of part performance, upon the ground that the agreement, though in parol, is enforceable in equity, when neither party elects to disaffirm it under the statute of frauds, because not in writing. This is the Tennessee rule, whose courts hold that a parol agreement for the sale of land is not void under the statute of frauds, but voidable only at the will of one of the parties.

2. The most troublesome question remains. Was the "agreement" between the banks and Rhea & Son, whether oral or written, anything more than a mere option to repurchase on the terms stated, which might be accepted or not at any time before it was withdrawn? Were Rhea & Sons absolutely obligated to take and pay for the property, even though it should be destroyed before payment of the price or conveyance made, or were they in possession under a mere continuing offer, which had neither been withdrawn nor accepted? An option is nothing more than a continuing offer to sell; but, until it is accepted, it does not become a contract of sale, for it lacks the element of an agreement between the minds of the parties. It is only when there has been an acceptance of a proposal to sell that the vendee becomes in any sense the equitable owner of the subject-matter of the option. Bostwick v. Hess, 80 Ill. 138; Willard v. Tayloe, 8

Wall. 557, 19 L. Ed. 501; Bradford v. Foster, 87 Tenn. 4, 9 S. W. 195; Boston Rd. v. Bartlett, 3 Cush. 224.

It is to be regretted that the charge of the court below did not deal more definitely with the distinction between a contract of sale and a mere option, though the trial judge did in general terms tell the jury that they were to say whether or not there was a "completed agreement" by which Rhea & Son were "to have the property back" on terms definitely stated, and to have title transferred to them when paid for. A "completed agreement" for the sale of a piece of property is plainly something more than an unaccepted offer to sell. It is equally clear that if there was in fact a "contract" for "the sale of the warehouse" to Rhea & Son, as was found by the jury, the existence of a contract implies an agreement by which one party had agreed to sell and the other to buy. If there had been no conflict in respect to the arrangement which did occur in the fall of 1893, and under which the plaintiffs were in possession of the insured premises at the date of the contract of insurance, the interpretation of the agreement, whatever it was, would have been a question of law for the court. But there was a disagreement of the most positive character. The plaintiffs claimed that there had been both an oral and written agreement for the repurchase of the property, and that the writing had been accidentally destroyed. The defendants denied any agreement of sale at all, and claimed that Rhea & Son were in as mere lessees. There was evidence tending to support both views.

But it is said that in fact the evidence tending to support the contention of the plaintiffs, if of any probative effect at all, proved that Rhea & Son were in possession under a mere continuing offer to sell, which had neither been accepted nor withdrawn, and that the court erred in not directing a verdict for the defendant upon this ground. If there is no substantial evidence from which the jury could justifiably have found that there was a "contract" for the purchase and sale of the premises, as distinguished from a mere continuing offer to sell which had not been accepted, there was no evidence upon which the jury could find that the insured were the "sole and unconditional owners" of the insured premises, and the jury should have been directed to find for the defendant as requested. That this particular phase of the insufficiency of the evidence was not specifically made the ground for the motion to instruct does not help the defendant in error; for if, upon any material issue in the case, there was no evidence for the jury, the court should have directed the verdict.

But, in determining whether the court erred in not taking this case from the jury, we are to remember that it was not the business of the judge to weigh the evidence. That is the function of the jury. He must, in determining the question as to whether there is any sufficient evidence, if credited by the jury, to justify a verdict in favor of the other party, take that view of the evidence most favorable to the party against whom the instruction is desired, and from that evidence and the inferences justifiably to be drawn therefrom say whether there is any evidence which would reasonably justify a finding for that party. Mt. Adams Ry. Co. v. Lowery, 74 Fed. 463, 20 C. C. A. 596; Travellers' Ins. Co. v. Randolph, 24 C. C. A. 305, 78 Fed. 754; Patton v.

Texas & Pacific Ry. Co., 166 U. S. 717, 17 Sup. Ct. 997, 41 L. Ed. 1186. Tested by this rule, and having regard to the weight to be attached to the action of an intelligent and impartial judge, who heard all of the evidence, and saw the witnesses, and submitted the case to the jury, we are unable to bring ourselves to the conclusion that there was no evidence which in law would justify the special finding of the jury that there was "a contract  *  *  *  for sale of the warehouse," rather than a mere offer to sell which had not ripened into a contract.

There was evidence tending to show, among other things, that the warehouse in question, together with a lot of stocks and other securities, had been transferred by Rhea & Son in satisfaction of their indebtedness to the two banks. As testified to by Mr. Berry, who represented the banks, this transfer "wiped up everything." Some months afterwards, the stringency in the money market having passed away, the same witness said:

"As they had been very valuable customers of ours, I went to Mr. Rhea in the fall of 1893, after the panic was over, and told him I thought he had such prestige in business that he ought not to quit, and it had been so profitable for us to handle his account that I proposed to have him undo his trade, give notes to us where they had collaterals, and make an agreement to take back the elevator property at the price paid, and I would lend him $7,000 to go with his business. He accepted the trade in writing, and Mr. Harris (cashier of the American National Bank) finished the negotiations, took all the notes from Mr. Rhea, and additional collaterals he had in our safe, in an envelope I knew nothing about, and turned in to us."

Asked as to what was the agreement as to the elevator or warehouse property, Mr. Berry answered:

"Mr. Rhea agreed to take back the elevator property from us, three-fourths interest, for $15,000, and he was to pay us 6 per cent. interest on the amount of money, and to pay all taxes, insurance, and repairs, and the ground rent,  *  *  *  until such time as he chose to have it deeded to himself or some one else."

The transaction was thus stated by Mr. Isaac T. Rhea, the active member of the firm of B. S. Rhea & Son:

"Mr. Berry, president of the American National Bank, was kind enough to say they wanted me to go in business, that my business was valuable to them, and that my assets were more valuable to me than anybody else—that I had a fine business, and must go on; and he induced me to buy back from him and from the First National Bank the collateral that they had, and by collateral I mean the different stocks and different things that they had; and I did so, and gave my note for it. They wanted me to take back, but I didn't want to incumber myself with a purchase of that character, but I agreed in this way, to pay the interest on my debt, which was $20,000, pay the ground rental to the Louisville & Nashville Railroad Company, to pay the insurance and all repairs, and go along and take possession of the house, and pay for it if I could. On these terms they turned the house over to me. The terms of that agreement were set forth in a letter to Mr. A. W. Harris, who was then the cashier of the bank."

Both Mr. Rhea and Mr. Berry state that no date was fixed for the payment of the price of the warehouse, both saying that he was to pay "when he could," or "when he could sell it," or "when it suited him," but that until he did so pay he was to pay annually the interest on $15,000 and keep the property in repair, insured, and the ground rent paid; and both agree that all of these agreed payments had been made

from 1893 down to the date of the fire, but that no part of the principal of the price had been paid. The evidence also showed that Rhea & Son gave notes for the securities returned to them and for the new money borrowed, but gave none for the price of the warehouse, or the old debt paid by its original transfer.

There was evidence, in part drawn out by cross-examination, which did have a strong tendency to indicate that Rhea & Son never did absolutely obligate themselves to buy the property, and that no notes were given for this property, because they were unwilling to incumber themselves to that extent. In further support of the theory of a mere option it was shown that the proofs of loss were made by the banks as owners, and that these were forwarded, with a letter from Mr. Rhea, in which he stated that Rhea & Son had been mere lessees of the warehouse, and had no interest in the insurance; but there were also certain explanations of these inconsistent statements, which went to the jury with other evidence upon the issue as to whether they were lessees or owners.

We were much impressed on the argument with the theory that Rhea & Son had not accepted the proposal to sell in any such way as to positively obligate them to pay for this property unless they should ultimately find it to their interest to so do; but, in view of the rule which requires that, before a verdict shall be directed, the most favorable view of the evidence must be taken in favor of the party against whom a verdict is directed, which is authorized by the laws of evidence, we are unable to bring ourselves to a conclusion that the court below erred in submitting this case to the jury.

The judgment is therefore affirmed.