NELSON et al. v. OHIO CULTIVATOR CO.

(Circuit Court of Appeals, Sixth Circuit. June 8, 1911.)

No. 2,102.

1. CONTRACTS (§§ 169, 170*)—EXTRINSIC AIDS TO CONSTRUCTION—CONSTRUCTION BY PARTIES.

A contract, if ambiguous, is to be construed in the light of the circumstances which surrounded its execution, and if the parties have given it a practical construction which harmonizes with what was probably their intention in view of such circumstances, that construction becomes a part of the contract itself, and will be adopted by the court.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 752, 753; Dec. Dig. §§ 169, 170.*]

2. CONTRACTS (§ 352*)—ACTION FOR BREACH—QUESTIONS FOR JURY.

Defendant contracted to manufacture machines under patents owned by plaintiffs during the life of such patents, and to pay royalties thereon, and also to sell and deliver a number of the machines to plaintiffs by a certain date. On their part plaintiffs were to give security to pay for such machines, if required, before defendant should be required to make them, and also to furnish the wooden patterns for the castings. Whether they were also required to furnish the metal patterns necessary to make the castings was a question in dispute. There was delay in giving the security, and also in furnishing the patterns, such that defendant could not complete the machines for delivery to plaintiffs by the time required, and when such time arrived defendant rescinded the contract, having made no machines. There was evidence tending to show that plaintiffs agreed to an extension of the time for delivery of the machines to them, and that defendant waived the delays. Held, on the evidence, that whether defendant was justified in rescinding the contract, and whether, if not, plaintiffs sustained substantial damages, were questions for the jury, and that the direction of a verdict was error.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1824–1828; Dec. Dig. § 352.*]

**3. TRIAL (§ 178\*)—DIRECTION OF VERDICT—CONSIDERATION OF EVIDENCE.**

It is the duty of the court, when a motion is made to direct a verdict, to take that view of the evidence most favorable to the party against whom the instruction is asked and from that evidence, and the inferences reasonably and justifiably to be drawn therefrom, to determine whether or not, under the law a verdict might be found for that party.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 401–403; Dec. Dig. § 178.\*]

In Error to the Circuit Court of the United States for the Northern District of Ohio.

Action at law by Frank J. Nelson and Frederick D. Bell against the Ohio Cultivator Company. From a judgment entered on a verdict directed by the court, plaintiffs bring error. Reversed.

Arthur C. Wade (Guy W. Kinney, on the brief), for plaintiffs in error.

C. A. Seiders, for defendant in error.

Before KNAPPEN, Circuit Judge, and McCALL and SATER, District Judges.

SATER, District Judge. At the close of the evidence the trial court, on the defendant's motion for a directed verdict, instructed the jury to find for it on the second and third causes of action, and nominal damages in the sum of $1, for the plaintiffs, on the first cause of action. The plaintiffs charge that this was error and seek a reversal. In our consideration of the case, reference will be made to such facts only in the voluminous record as are reasonably necessary to a determination of the questions presented.

On October 27, 1906, the plaintiffs, citizens of New York and owners of certain letters patent, issued in 1897, for improvements in potato planters and diggers and potato cutters and droppers, entered into a contract with the defendant, of Bellevue, Ohio, to run for the life of the patents, whereby defendant, an Ohio corporation and an extensive manufacturer of agricultural implements, agreed to manufacture, in a good, substantial, workmanlike manner, of good durable material as many of the machines each year as could be sold or as the trade demanded, and to sell the same either singly or in combination as the trade required. It bound itself to use its best endeavor to sell the machines and advertise them throughout the large territory in which it transacted business, at a rate fairly to compete with similar machines of similar utility and cost of production, and to pay the plaintiffs $5 for each machine sold singly, i. e., as a planter or a digger, and $10 for each machine whose parts were sold in combination. The plaintiffs agreed to purchase 50 of the completed combined machines for $3,500, to be sold by them in New York, for which state they reserved the exclusive right to sell the patented device. These machines, on which no royalty was to be paid, were to be delivered to them on March 1, 1907, for which the plaintiffs, at the time of delivery, were to give their note maturing December 1, 1907. Except as to the 50 machines above mentioned, the defendant was to furnish plaintiffs machines and extras

for the New York trade at market price. Whenever the royalties paid aggregated $50,000, the defendant was, by assignment then duly to be made by the plaintiffs, to become the sole owner of the patents, and the payment of royalties was thereupon to cease. The plaintiffs were to furnish at their own expense all metal patterns, core boxes, dies, and templets necessary to manufacture the machines, and to defend at their own expense any patent litigation that might arise from infringement, so long as the defendant manufactured in accordance with the patents. They aver in their amended petition, and support such averment by their evidence, that subsequent to the execution of the written contract a parol agreement was entered into that the defendant should manufacture the metal (gray iron) patterns, core boxes, dies, and templets, but Stahl, the defendant's president, denies that any such modification of the written contract was made. At the same sitting at which the written contract was executed, the plaintiff Nelson, by a separate written instrument, represented and warranted that he was financially responsible for the 50 machines to be delivered to him by the defendant on March 1, 1907, to the amount of $3,500, and that, if upon investigation, such was not found to be the fact, he would execute and deliver a bond before he required the delivery of the goods. On March 1, 1907, the defendant, alleging as a reason therefor that the plaintiffs had, by their failure to observe their contract of October 27th, made defendant's compliance with it impossible, canceled the contract and notified them to remove such property of theirs as was then at its factory. This the plaintiffs did and thereafter sued for damages. In their first cause of action they seek to recover $50,000 for breach of contract on account of defendant's failure to manufacture and sell the machines and pay the stipulated royalties. They aver that had the defendant proceeded with the performance of its contract, they would have sold 5,000 of the combined machines, in consequence of which they would have received royalties in the sum so claimed as damages. The second cause of action is for $2,750, being profits alleged to have been lost through the defendant's failure to make and deliver the 50 machines for sale to the New York trade in 1907, and for expenses incurred by plaintiffs in preparing to care for such trade and in the performance of their contract prior to its cancellation. The third cause of action is for damages for breach of contract in failing to supply the plaintiffs with machines for the New York market, exclusive of the 50 machines above mentioned. They allege that they could have realized a profit of $50 on each machine sold, and could have netted a total profit of $50,000.

The answer, among other things, denies the utility of the machines, and the defendant's obligation to make more than 50 of them for the trade of 1907, or to make any metal patterns, core boxes, dies, and templets, and charges a failure on the part of plaintiffs to furnish such articles in time to permit the construction of the machines at the time stipulated. It also charges misrepresentation as to the plaintiffs' financial responsibility, a refusal on their part to extend the time for the building of the machines, and the making, on February 18th, of a new

contract for their construction, for $3,150 cash in advance, and the repudiation of such contract by the plaintiffs.

The question for decision is: Did the court err in directing a verdict as above mentioned? As the answer to this question must be wrought out from the incidents connected with the plaintiffs giving bond for the 50 machines to be delivered March 1, 1907, and from their respective duties and acts as regards the making of the metal patterns, core boxes, dies, and templets, these subjects will be considered in their order.

Standing alone, the obligation given by Nelson to furnish bond for the 50 machines to be made and delivered for the New York trade, if an investigation proved that he was not financially responsible for their cost, was personal to him, and the bond, if required, would have been timely, if given at any time before the goods were delivered. An examination promptly conducted by the defendant resulted in a demand for additional security, with which demand Nelson, with equal promptness, promised to comply. He wrote:

"Before you are required to manufacture any of the machines I will furnish you such security as may be satisfactory."

Fearing that his associate, Bell, who had wasted his estate on patents and whose relation to him as regards this transaction was that of a partner, might not respond to his portion of the liability for the machines or bear his just part of the expenses to be incurred in launching and maintaining the contemplated New York selling agency, and deeming it unwise to make any definite arrangements as to security until Bell had heard from a relative who was to furnish him financial backing, Nelson sought and finally obtained the defendant's consent to accept security from him for one-half only of the cost of the machines and from Bell for the residue. The defendant from the first and at all times interpreted the contract to mean that the bond was to be furnished before it began the manufacture of the machines, and although Nelson on different occasions requested the defendant to take the preliminary steps necessary to the procurement of stock for the building of the machines, both he and Bell at all times acquiesced in and never disputed the correctness of that interpretation. Moreover, the evidence of both Nelson and Stahl reveals an understanding that the bond or security was to be given upon its being ascertained that Nelson was not financially responsible. Ordinary prudence on the part of the defendant, who was about to engage in the manufacture of an article of whose practical utility comparatively little was known on account of the slight use to which it had been put, would suggest this protecting precautionary course of procedure. Notwithstanding the apparent meaning of the language of his obligation of October 27th, considering it in the light of the circumstances which surrounded its execution, evidence of which was admissible (Page on Contracts, § 1123), and the construction uniformly placed upon it by all the parties throughout their voluminous correspondence and the whole of their dealings with each other, it must be held to mean, on the record submitted, that the security it called for was to be furnished the defendant before it entered upon the manufacture of the machines.

[1] The parties having placed on their contract a practical con-

struction which harmonized with their understanding at the time of its execution, that construction became a part of the contract itself and the court will therefore adopt it. Insurance Co. v. Dutches, 95 U. S. 269, 24 L. Ed. 410; Gorrell v. Home Life Insurance Co., 63 Fed. 371, 378, 11 C. C. A. 240; Seymour v. Warren, 179 N. Y. 1, 6, 71 N. E. 260.

[2] Although the instrument plainly calls for a bond to be delivered by Nelson, and although the defendant made repeated urgent appeals, down to and including January 23d, for its early delivery, that it might proceed with its performance of the contract, Nelson attempted in one of his letters of December 3d to cast on defendant the responsibility of procuring from Bell his portion of the security to be furnished, and sought to substitute first one thing and then another as security for himself, and wrote the defendant to notify him what it required in that respect, even after it had plainly written him that it would accept a satisfactory bond from each of the plaintiffs for one-half of the total amount of the cost of the machines. He did not forward his bond until January 25, 1907, some three weeks after Bell, against whom he wished to protect himself, had sent his bond to the defendant. There then remained but little more than a month in which to build and deliver the machines.

The machines could not be manufactured without the required patterns, core boxes, dies, and templets. The defendant was responsible for the procurement of the malleable castings, but as it was not equipped to make them, it contemplated having them made at the Malleable Iron Works at Marion, Ohio. Their production, however, must necessarily be subsequent to that of the metal patterns, and these latter were to be made from wood patterns, for which the plaintiffs were responsible. The controversy is as to who was to make the metal patterns. The first machine made under the patents was constructed in 1901, and only about ten or a dozen had been built prior to the date of the contract in question. Nelson testifies that at the time the contract was made he informed the defendant that he and Bell had some metal patterns which they had used in the manufacture of machines, but that some of them were lost and others were no longer serviceable, that some changes in the patterns would have to be made, and that he would ascertain what new patterns were necessary and would have a pattern maker then working for them to make such as were lacking. His statement contained in his letter of November 24th, that "In looking over our patterns we have found them in bad condition, and are now having many of them replaced by a pattern maker," reads, however, like the recital of a newly discovered fact. Stahl testifies that Bell told him on the date of the contract that while the machine worked satisfactorily in New York, he found that the soil and conditions and the methods of planting potatoes varied in different localities, and that he would have to make changes in the digger so that it would not choke up and would separate the potatoes from the soil. There is considerable evidence that the machine worked successfully in New York in a variety of soils. There is also considerable evidence that it worked quite imperfectly when tested at Bellevue; that

it choked up and failed fully to separate the potatoes from the earth, as Stahl says Bell told him it would do. Even portions of Bell's evidence point in the same direction. The parties, therefore, when they engaged in their joint enterprise, knew that changes would be made in the digger and consequently in the patterns, and if they did not then know, they soon learned, that old patterns would have to be replaced, and that such reasonable delay as would necessarily be incident to such changes and the making of new patterns, would occur. On November 8th, Booher, who was then, and until the following February 1st, the defendant's secretary, in urging Nelson to promptness in giving security, wrote:

"We would be pleased to hear from you by return mail, and would like to get at this part of the business at the earliest date possible, and as the malleable proposition is getting to be quite a serious one, and unless we can get to work on the patterns and get them in shape to go to the malleable people, we might be delayed in getting out this stock. We have practically 90 days in which to complete all arrangements and get things in shape."

Counsel are not agreed as to the construction to be placed on that language. Stahl says that after metal castings are prepared there still remains work to be done on them before they can go into the sand, and that this was work necessarily precedent to sending the castings to the defendant's shops and the malleable people, and was that to which the letter refers. The plaintiffs, however, contend that the language employed is an admission of duty on defendant's part to make the castings. On November 28th, Booher wrote Nelson:

"We cannot impress you too strongly the importance of getting matters shaped around so that the malleables for the potato digger and planter can be put into the sand in order to insure our getting them promptly when you require them for the trade."

Nelson's reply was a request to vary the contract to the extent of constructing the planters for delivery March 1st, and the diggers later, for the reason that Bell had made and was working on some advantageous improvements in the digger which he desired to submit to the defendant before the diggers were built. This same request was repeated later, accompanied with a suggestion, which Bell disclaims as having originated from him, that the proposed improvements could not be tested until the frost was out of the ground. The inference which this suggests seems to be that Nelson did not then know and could not know what the ultimate form of the digger patterns would be, until the contemplated improvements were made and tested in the following spring. The defendant declined to comply with Nelson's requests. On December 1st, defendant asked for advice as to what improvements Bell contemplated and when the patterns and everything, manifestly meaning the bond, would be ready, as the patterns should go into the sand not later than January 1st, in order to have the 50 machines ready at the stipulated time, and urged diligence, as it did repeatedly in the course of their extended correspondence, in the submission of both the patterns and the bonds. Notwithstanding these urgent appeals for prompt action, on December 6th Bell wrote the defendant inquiring when it would need the patterns to commence manufacturing. He said

he had made some changes and mostly new patterns, and that part of them would have to be made into metal after reaching the defendant, as the plaintiffs had no facilities for making patterns of that kind. He said the patterns, which proved to be mostly wooden patterns, were then ready to ship. This letter does not consist with his later claim that the defendant had obligated itself to make the metal patterns, nor is Nelson's letter of January 24th helpful to the plaintiffs' contention, for on that date, while still promising to give satisfactory security and suggesting methods of furnishing it, he wrote that he had been informed by Bell that the defendant was unable to make the metal patterns, which he very much regretted, as he understood that it was to make them, and that that was why the patterns were hurried and forwarded. He added that he was informed by Bell, who was then at Bellevue, that he was obliged to have the patterns made by another man. He expressed an understanding that the defendant was to make the patterns, but there was no insistence on the existence of a contract to that effect. He acquiesced in the employment of another person to make them. This letter was in answer to that of Booher's of January 18th, in which he reported Bell's arrival and that:

"We find there will have to be metal patterns made, which is going to require considerable time and it will necessitate some tall hustling in order to get these machines in shape for use March 1st."

This language is consistent with the defendant's denial of a contract on its part to make the metal patterns, and also imports the discovery of an unexpected condition. The wood patterns were shipped to the defendant December 22d, with a promise from Nelson that the metal patterns would be forwarded on the following Monday. On December 28th, the defendant acknowledged receipt of the patterns shipped, and noted that the metal patterns would follow in a few days, and added, "This is all right." The metal patterns, however, did not reach it until Bell, who had gone to Bellevue in response to defendant's request of January 12th, arrived with them on January 17th. He took with him no dies or templets, and none were ever furnished, nor were any core boxes, other than wooden ones, supplied. He had some dies at Pittsburgh, which he proposed, some time after February 12th, to have forwarded, but says that one of defendant's foremen suggested that the defendant had certain dies which might be used in their stead, and that he therefore did not send for those at Pittsburgh. There is no evidence, however, that the foreman had authority to speak for the defendant, or that defendant did not have dies of the character mentioned. Stahl says that some of their dies for making shovels might have answered the purpose. The defendant had no templets available, but Bell says their use was not necessary until the machines neared completion. He further testified that on his arrival Booher told him "We would get to making the patterns right away," but delayed it and finally announced that they could not be made by the defendant, an announcement which drew no protest from Bell, though Hoyt says that Bell told him that he had expected defendant to make the patterns. Bell thereupon employed a pattern maker and began the making of patterns on January 28th, and delivered them on February 12th, which, ac-

cording to Hoyt, was as soon as they could have been completed by the defendant. The defendant assisted in this work by permitting the use of its men and shops after working hours, Bell paying for the material used and the services of the men. On January 23d, the defendant notified Nelson that the machines could not be gotten out by March 1st, that the delay was due to the failure promptly to deliver the patterns and give the required bond, and that Bell was uncertain about going forward in face of the fact that the machines could not be completed until two or three weeks beyond the agreed time, but said, while it might be a little late for them to get the machines into the hands of their agents, it believed there would be ample time for them to take care of their customers, provided there was no further delay about the patterns. Thereupon Nelson forwarded his bond on January 25th, which probably reached Bellevue the day following. On the 17th of February he visited that place. On substantially all material points, the evidence is conflicting as to what was said and done between the parties on the occasion of that visit. It sufficiently appears, however, that the defendant was willing to go forward with the construction of the machines, if a satisfactory extension of time could be had, but the evidence is not harmonious as to whether Nelson demanded compensation for the extension, or as to whether Stahl feared it would release the sureties on the bonds or guaranties given by plaintiffs. Nelson says he was willing to waive the delivery of the machines on March 1st, and this seems to be the logical inference deducible from his letter of January 23d. He further states that Hoyt at one time agreed to send the patterns by a special messenger to Marion and make a special arrangement for the early delivery of the malleable castings and to have the machines ready in a short time, but all this is denied by Hoyt. Following Nelson's visit the defendant took no further action until it notified the plaintiffs of the cancellation of the contract.

It is clear that, under conditions existing February 17th, the machines could not have been completed for delivery by March 1st. There is evidence that from 6 weeks to 60 days would have been consumed in preparing and returning the malleable castings to Bellevue, and that from 15 days to 3 weeks would have been thereafter required to prepare the machines for shipment. There is also evidence which tends to show that these estimates of time required are too great.

The learned trial judge rightly found that there was more than a scintilla of evidence that the defendant was obligated to make the metal patterns, but held that the submission of that question to the jury was unnecessary because the plaintiffs' failure to furnish the patterns, core boxes, dies, templets, and security forbade the delivery of the machines on March 1st, and hence the defendant was relieved of its obligation in that respect. He was further of the opinion that the defendant had so breached the contract, which was to run for a number of years, as to warrant a finding against it on the first cause of action, but that nominal damages only were recoverable on account of the uncertain and speculative character of the damages sought.

Notwithstanding Nelson's dilatory, vacillating and unbusiness like conduct, and the tardiness of Bell, and the further fact that the plain-

tiffs did not place the defendant in a position in which it could be put in default until after Nelson delivered his bond, was there, nevertheless, evidence from which the jury might have rightfully found that the defendant was obligated to make the metal patterns, that Booher said on Bell's arrival at Bellevue on January 17th that the defendant would at once begin the making of them, that Hoyt promised by special arrangement with the malleable people to get the castings and complete the machines at an early date, and that the defendant's conduct was not such as to relieve it from the construction and delivery of the 50 machines, or to warrant it in canceling the contract? Might not the jury, properly instructed, have found that the invention, possessed utility, that somewhat more than nominal damages had been sustained, that a tangible loss occurred through Nelson's inability to deliver to the New York trade only about a dozen of the 18 machines which he says he sold at a profit, and that the defendant awakened and fed the expectation and belief that it would perform and thereby induced the plaintiffs to engage in labor and incur expense, to their financial detriment? Might not the jury have found that the making of the metal patterns, if it held that the defendant was required to make them, would have entailed on it no loss? Nelson's testimony is that the plaintiffs were to pay for their making, and they did in fact pay for all materials and labor furnished by the defendant. The making of the patterns would in no wise have been a waiver of or militated against the provision of the defendant's contract that it should not be required to enter upon the manufacture of the machines, until the patterns were ready and the security for the machines given. Might not the jury have found that the plaintiffs so breached their contract that the defendant was entitled to substantial damages for loss of profits in the manufacture of the machines, as an offset against any injury the plaintiffs claimed and were found to have sustained? We think all of the above queries should be answered in the affirmative, and that from the facts in evidence fair-minded men might have drawn different conclusions. The questions, therefore, are not of law, but of fact, and should have been left to the jury for settlement, under proper instructions from the court. Mason & O. R. Co. v. Yockey, 103 Fed. 265, 43 C. C. A. 228.

The defendant, it is true, repeatedly warned the plaintiffs of the danger of delay in furnishing bond and patterns, but it persistently urged them to proceed with the contract, with a declaration of its purpose to perform. It informed them that the patterns should be in the sand by January 1st, and yet on December 8th expressed its satisfaction that the unshipped patterns would be sent in a few days. In that same letter it invited both Nelson and Bell to come to Bellevue to close up matters regarding the security and the patterns, and especially did it so request because Bell would have to come in any event to go over the machines with the defendant's purchasing agent, as well as with its manufacturing department. On January 12th it wrote that Bell should come at the earliest date possible "to take this matter in hand." When he arrived on the 17th its purchasing agent took up with him the matter of building the diggers and planters for the purpose of

ordering materials for their construction. It not only made no announcement then that it would not go forward with the contract or could not complete the machines in time, but on the day following wrote Nelson that Bell had given his portion of the security, inquired what kind of security he, Nelson, intended to give, and stated that "tall hustling" would be necessary to get the machines ready by March 1st. On January 23d, it first notified Nelson that the machines could not be completed within the time agreed. It was not the defendant that was then hesitating about going forward, but Bell, who feared that Nelson might not wish to proceed on account of the two or three weeks delay then thought to be inevitable in the completion of the machines. As late as January 28th, without warning Bell of the futility of making the metal patterns, it witnessed his beginning that labor and incurring the expense incident thereto. As the work progressed it lodged no complaint that the machines could not be put out on time. The patterns were delivered on February 12th. Whether they were accepted or not need not be determined, as there is evidence that they were not satisfactory and other evidence that the dissatisfaction was unreasonable. But the defendant did not then refuse to proceed with the contract or affirmatively do so until March 1st. During all the time that elapsed after the contract was made the defendant was so circumstanced as to be better informed than the plaintiffs as to the time the malleable people would require to supply the needed castings. It knew that the plaintiffs were making expenditures for wood patterns, had rented and were paying rent for a store room in which to transact the business of their New York selling agency, were getting out circulars for the trade, were incurring traveling expenses and the cost incidental to the manufacture of the metal patterns, and were relying on the fulfillment of the contract. In the third defense set up in its answer the defendant alleges that, on February 18th, the parties agreed that it should proceed with the construction of the machines for an advance cash payment of $3,150, and that the plaintiffs repudiated the agreement on the following day. The significance of this defense is that down to and including the last-named date the defendant was still ready to perform.

[3] We are not called upon to say that, in the light of all the facts in evidence, a jury would have found for the plaintiffs, or that the trial court, having heard the evidence and having seen the witnesses who gave it, might not on a motion for a new trial, have held a recovery by the plaintiffs, had there been such, to a small amount, or even set the verdict aside, because there is a difference between the legal discretion of a court to set aside a verdict as against the weight of the evidence, and the obligation, which a court has, to withdraw a case from the jury and direct a verdict for insufficiency of evidence. Mt. Adams & E. P. Inclined Ry. Co. v. Lowery, 74 Fed. 463, 20 C. C. A. 596. It is not a proper test of whether the court should direct a verdict that the court in weighing the evidence would, upon motion, grant a new trial. On the contrary, it is the duty of a court, when a motion is made to direct a verdict, to take that view of the evidence most favorable to the party against whom it is desired that the verdict

should be directed, and from that evidence, and the inferences reasonably and justifiably to be drawn therefrom, determine whether or not under the law a verdict might be found for that party. Milwaukee Mechanics' Ins. Co. v. Rhea & Son, 123 Fed. 12, 60 C. C. A. 103; Rochford v. Penn. Co., 174 Fed. 83, 84, 98 C. C. A. 105; Travelers Ins. Co. v. Randolph, 78 Fed. 754, 759, 24 C. C. A. 305; Standard Life & Accident Ins. Co. v. Thornton, 100 Fed. 582, 40 C. C. A. 564, 49 L. R. A. 116.

Applying to the evidence the settled rule that governs the direction of verdicts, we are constrained to hold that the defendant's motion for a peremptory instruction should have been overruled. The case is therefore remanded to the court below, with directions to set aside the judgment and grant the plaintiffs a new trial.