THOMAS B. WHITTED & CO. v. FAIRFIELD COTTON MILLS.

(Circuit Court of Appeals, Fourth Circuit. November 4, 1913.)

No. 1160.

1. CONTRACTS (§ 29*)—FRAUDS, STATUTE OF (§ 159*)—MAKING OF CONTRACT—
QUESTION FOR JURY.

A memorandum, shown to be a specification of machinery for defendant's cotton mill, designating certain items to be furnished by plaintiff with the aggregate price of the same marked thereon, with testimony that such items and price were agreed upon between the parties, and that the memorandum was then delivered by defendant to plaintiff as the basis for a formal contract to be drawn and signed later, together with letters subsequently written by defendant to plaintiff, expressly recognizing the existence of a contract with plaintiff for that particular work, and disclosing a knowledge on the part of defendant that plaintiff was proceeding to carry out such contract, *held* sufficient evidence to require the submission to the jury of the question whether a contract was made, and whether it was sufficiently evidenced under the statute of frauds although the formal writing was never executed.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 141–143, 1824; Dec. Dig. § 29;* Frauds, Statute of, Cent. Dig. § 378; Dec. Dig. § 159.*]

2. CONTRACTS (§ 32*) — FORMAL REQUISITES — AGREEMENT TO BE REDUCED TO
WRITING.

Although the parties to a verbal agreement, the terms of which are mutually understood and agreed upon, contemplate that it is to be reduced to writing and signed, yet, if the understanding is that this is simply to be done as a memorial of the agreement, it is binding notwithstanding it is never put to writing.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 159; Dec. Dig. § 32.*]

In Error to the District Court of the United States for the Eastern District of South Carolina, at Columbia; Henry A. Middleton Smith, Judge.

Action at law by Thomas B. Whitted & Co. against the Fairfield Cotton Mills. Judgment for defendant, and plaintiff brings error. Reversed.

D. W. Robinson, of Columbia, S. C., for plaintiff in error.

W. D. Douglas, of Winnsboro, S. C. (J. E. McDonald, of Winnsboro, S. C., on the brief), for defendant in error.

Before PRITCHARD, Circuit Judge, and KELLER and CONNOR, District Judges.

PRITCHARD, Circuit Judge. This is an action at law, instituted in the District Court of the United States for the Eastern District of South Carolina, by Thomas B. Whitted & Co., plaintiff in error (hereinafter designated as plaintiff) against the Fairfield Cotton Mills, defendant in error (hereinafter designated as defendant), to recover loss and damages alleged to have been sustained by the plaintiff by reason of the cancellation on October 7, 1909, of a contract alleged to have been made by the plaintiff with the defendant on the 29th day of May, 1909, to furnish and install certain portions of a steam power plant.

The plaintiff alleges that on the 29th day of May, 1909, the defendant entered into an agreement with the plaintiff to furnish and install a considerable portion of a new power plant for the defendant, consisting of boilers, pumps, feed-water heater, oiling system, and piping in accordance with plans and specifications, to be furnished for the price of $9,533; that on the ———— day of September, 1909, subsequent modifications and additions were made, increasing the price to $13,131. It is further alleged that, in pursuance of the contract awarded to it, plaintiff was proceeding to carry out the contract, and, with the knowledge and approval of the defendant, had ordered the manufacture and contracted for the purchase of various parts of this equipment which had to be especially built, and for which plaintiff incurred considerable financial liabilites.

Among other things the defendant in its answer denies the execution of the contract, but admits that the plaintiff, through his engineer, made sundry measurements, and secured all necessary data and information upon which to base a proposal for supplying the defendant with a steam plant. That thereafter, on or about May 29, 1909, plaintiff made a proposal for furnishing and installing for the defendant various portions of a power plant.

"That said proposal made by the plaintiff was written in longhand, which contained memorandum of additions and amendments made thereon in the office of Charles T. Main, consulting mill engineer of the defendant, and, together with all details and particulars of the contract or agreement, as understood and to be accepted by the defendant, were to be typewritten by the plaintiff or its representative, in due form, with all the necessary specifications, within a few days thereafter, and a copy thereof to be furnished and submitted to the defendant's consulting engineer, and also copy thereof to be furnished by the plaintiff to the defendant, and the same was to be duly signed and executed by the contracting parties so as to make a binding contract on both parties.".

It is also averred by the defendant that it requested plaintiff to furnish the said proposal, typewritten in due form, subsequent to 29th day of May, 1909, but that the plaintiff failed to furnish the same until the 28th day of September, 1909; that the contract furnished at that time was greatly at variance with the terms and proposal which were to be accepted by the defendant as to the amount to be paid for the material to be furnished by the plaintiff, and that the defendant declined to accept the same, and that no contract in writing was ever executed by defendant.

At the trial of the case in the court below after the witness (Whitted) had testified, the court announced that it was of opinion that plaintiff was not entitled to recover, in that it had not shown that a contract existed as alleged in the pleadings, and also refused to hear any further testimony on the part of the plaintiff, and directed a verdict in favor of the defendant. Plaintiff excepted to the ruling of the court, and the case now comes here on writ of error.

[1] Assignments of errors Nos. 1, 2, 3, 4, 5, 7, and 8 are intended to raise the question as to whether the parties to this controversy entered into a contract on May 29, 1909, as alleged by the plaintiff. The proposal, which was submitted by the plaintiff, bears date of May 22d. Thomas B. Whitted was introduced as a witness in the court below,

on behalf of the plaintiff; he testified that he was president and principal stockholder of Thomas B. Whitted & Co. In referring to the proposal which was made to the defendant company, the witness said:

"Q. Did you enter into negotiations in April, 1909, with the Fairfield Cotton Mills through Mr. Elliott, with reference to a power plant? A. I did.

"Q. Now, in pursuance of these negotiations, what transpired on the 29th of May between you and the Fairfield Cotton Mills, and any consulting engineer if they had one? A. I was awarded a certain contract to furnish boilers, pipework, condenser, and water meter.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. Where did that take place [handing witness paper]? A. In the office of Charles T. Main, consulting engineer, Milk street, Boston.

"Q. Consulting engineer employed by whom? A. Fairfield Cotton Mills.

"Q. To make out their plans and drawings? A. Yes.

"Q. This is the paper that was made in that office, memorandum? A. Yes.

"Q. In whose writing? A. This paper was given me by Mr. Elliott, and I presume is in his writing; if not, why, it was presumably written— (Objected to by Mr. McDonald.)

"Q. Was it given to you there in the office? A. It was.

"Q. For what purpose?

"Mr. McDonald: We object.

"Court: He is testifying that he was in conference with Mr. Elliott and Mr. Main, Mr. Elliott, of the Cotton Mills, and Mr. Main being his employé for that purpose; if that paper was given to him by either of those people, he can put it in evidence.

"Mr. Robinson: We offer the paper in evidence.

"Mr. McDonald: We object, because it is not identified by any one, and it is not signed by any one to be charged, and we object to it on that ground. Our defense is that there was no contract between these parties in writing, and this paper is not signed by any one; we don't know who made the first two there.

"Mr. Robinson: The first two pages we don't insist upon; it is only the last.

"Court: If he testifies that that paper was handed to him by one authorized to do it by the defendant.

"Mr. McDonald: He says it was handed to him by some one in Mr. Main's office.

"Q. What was Mr. Elliott's relation to the Fairfield Cotton Mills? A. My understanding was that he was the president of it.

"Q. Did you meet him in Mr. Main's office by his appointment? A. I did.

"Q. Did you meet him there for the purpose of making a contract to install certain parts of a power plant?

\*    \*    \*    \*    \*.    \*    \*    \*    \*    \*

"Court: If you have a note stating the purpose you had up there, produce it.

"Witness: A note asking me to be at the office at two o'clock.

"Mr. McDonald: We object to that and move to strike it out.

"Court: If he does not produce it I will strike it out.

"Q. Have you a note written to you by Mr. Elliott making this appointment? A. I have.

"Q. Is that the paper you hold in your hand? A. It is.

"Q. Did you go to Mr. Main's office in pursuance of that invitation? A. I did.

"Q. Meet Mr. Elliott and Mr. Main? A. I did.

"Q. For what purpose? A. For the purpose of endeavoring to sell them machinery and install same.

"Q. To be installed where? A. At the plant of the Fairfield Cotton Mills, Winnsboro, S. C.

"Q. While you were there for that purpose was that memorandum given to you? A. It was.

"Court: By whom given to you? A. By Mr. Elliott in person.

"Q. And the figures down there were 9,533? A. Yes, sir.

"Q. At the top of the paper is an engine—Filer and Stowell at $11,000; what did you have to do with furnishing the engine?   A. Nothing.

"Q. That was not a part of your contract?   A. No, sir.

"Q. Was that contract to your knowledge awarded to some one else at that time?   A. Yes, sir.

"Q. For what purpose was that paper and memo. given to you?

"Mr. McDonald: We object to that; the paper will speak for itself.

"Court: Ask him what was said:

"Q. What was said at the time the memorandum was given to you by Mr. Elliott, or by Mr. Main, his consulting engineer, in his presence?   A. Considerable time had been spent in discussing the question of price; it was getting late, Saturday evening, and finally Mr. Elliott and myself went into one of the offices of Mr. Main alone, and discussed this proposition in general, and the question of price was being discussed, and finally the price of $9,583 was agreed upon, making certain omissions and deductions from the original figures submitted, and this memo. was given me as that portion of the work that was to do; it was the basis that I was to go home, prepare contract, prepare drawings and get ready for Mr. Main's O. K. and Mr. Elliott's signature.

"Q. When you went back had you prepared at that time drawings, specifications, and contract?   A. I had."

Further on the witness testified as follows:

"Q. What parts of it, in a summary way, not in details?   A. Boilers.

"Q. The short pencil memo. gives it, does it not?   A. Yes, sir; that short form of contract.

"Q. This paper, Exhibit 2, shows, but not all of that paper was to be furnished by you, was it?   A. No, sir, on this first in our proposal was machinery covered by this entire list, but only a certain portion of this in my list was awarded to me, and in addition it was on my list that there were certain things that were also awarded to me which were not called for in that proposal, but which I was to furnish; I was to furnish boilers specified in my proposal, the heater specified in my proposal, two different manufacture; a feed pump in my proposal I was to furnish an injector; oiling system, piping was not specified, but was stated by me verbally to be furnished; a flue condenser was to be furnished in lieu of surface condenser which my proposal called for.

"Q. Was this proposal of May 22d examined by Mr. Main and Mr. Elliott before you went to their office?   Was it in his possession?   A. I presume they were; they displayed a certain amount of familiarity with them when I was finally admitted for conference.

"Q. In pursuance of that, what other paper have you there?   A. This is a copy of a proposal of May 22d of one that I left with Mr. Main's office, prepared by one of his assistants, Mr. Gumby, which were supposed to incorporate certain agreed to changes, and was his understanding of what Mr. Elliott had awarded me on the basis of the drafts, etc., and sent by him to me as his memo. of what he thought the understanding was."

It appears that in pursuance of the memorandum agreed upon by the parties as embodying the contract, plaintiff immediately began to do those things that were necessary for the performance of the same. The witness testifying as to this point, said:

"Q. What machinery drawings were required before you could proceed with your work, if any?   A. The most important one was the engine foundation plan.

"Q. Who was furnishing the engine under the awards made at Mr. Main's office, under the first award made there on the 29th of May?   A. Providence Engineering Company, Providence, R. I.

"Q. Was it necessary or not for you to have their plan before you could proceed with the rest?   A. It was absolutely necessary.

"Q. Why?   A. In order to determine the size of steam pipe that was necessary for conveying the steam to the engine; it was necessary to have the

length and width of the engine in order to locate it; it was necessary to have the size of the exhaust of the engine before the size of the opening that was necessary in the condenser could be determind, and it was necessary to know this size before any of the pipework could be ordered out or even drawn in the drafting room; it was necessary to know the high pressure cylinders in order to get that pipework out or even to get it on the draft board.

"Q. What steps did you take to get these specifications or drawings from the Providence Engineering Company?  A. I wrote first, I believe—if I can refresh my memory—I have a memo. of that as to the date.

"Q. We can get the letters themselves; I wanted to shorten as much as possible.  A. I wrote Mr. Charles T. Main, January 7, 1909, complaining that I had not received any drawings from the Providence Engineering Company.

"Q. Did you take it up with Mr. Elliott?  A. I did.

"Q. When?  A. January 21st.

"Q. Whose place was it to furnish these plans of the engine, or drawings?  A. It was the business of the Providence Engineering Works to furnish them to both the mill and the Consulting Engineer, and for the mill to see that I got them.

"Q. Was it your duty to make any drawings and specifications or blueprints in connection with this contract?  A. Yes, absolutely.

"Q. What drawings and specifications should you make?  A. The drawings and specifications of the entire piping system and the agreement of all the machinery, the respective locations of the various parts of it, as regards the building.

"Q. Who was to put the foundation work down to this plant?  A. The mill, the Fairfield Cotton Mill.

"Q. The mill itself?  A. The mill itself.

"Q. By what information would they put that down?  A. From drawings we would furnish them."

While the defendant denies the execution of the contract, yet, there is much in the correspondence offered in evidence which tends to show that plaintiff, immediately after the 29th day of May, proceeded to do those things that were necessary to the performance of the contract in good faith, and that defendant had full knowledge of the same.

The plaintiff offered testimony in support of its contention that the conduct of the defendant was such as to lead plaintiff to believe that the defendant recognized the memorandum of agreement as the contract, in pursuance of which this particular work was to be performed.

It is also insisted by plaintiff that its evidence tends to show that the defendant by its conduct caused the plaintiff to believe that it acquiesced in the memorandum of agreement as the contract in accordance with which the work was to be performed.

On the 4th day of June the president of the defendant company wrote the plaintiff company as follows:

"In the matter of dia. of boiler tubes for the new steam plant which you are to install for us, we have decided to use 3½ in. tubes after full consideration of the whole subject."

On August 5th, the consulting engineer employed by the defendant, whose duty it was to supervise the performance of this work, in a letter addressed to the plaintiff, among other things used the following expression:

"In regard to the contract which you have for the Fairfield Cotton Mills, will say that we have never received the plans of the piping which were to be provided before the contract was signed.  Mr. Church of the Cooper-Corliss Engine Company, informs us this morning, that the plans had been sent you on

July 19, showing the details of the engine, and we presume that by this time you have been able to complete the layout of the piping."

The consulting engineer, in a letter addressed to the defendant, returning certain blueprints made by the Westinghouse Company, containing a number of suggestions as to changes, and asks the advice of Mr. Elliott, and also adds:

"You will note that Whitted has not yet placed the contract for this condenser, and that it will now be doubtful as to whether the condenser can be gotten to the job on time. We think it will be well to have Whitted place this order as soon as possible, and also to make such changes in the piping plans as will meet such of our suggestions as you think of value."

Thus it will be seen that this controversy involves the question as to whether that which transpired on the 29th day of May was sufficient to constitute a binding contract between the parties. It is fundamental that in order to constitute a contract there must be a meeting of the minds of the parties as to a definite proposition. In this instance the defendant was anxious to have certain equipment installed in its plant, and the evidence shows that the plaintiff was willing to perform this work, and as a preliminary step to the making of the contract made certain measurements, and did other things that were necessary to enable it to furnish an estimate as to the cost of the same, in order that the defendant might understand the amount and character of the work to be performed, and the price to be paid therefor. This estimate was incorporated in a proposal by the plaintiff to the defendant to perform the work in question according to specifications.

### Exhibit 2.

#### Apparatus Decided on.

|  |  |  |
|---|---|---|
|  | 1 Engine—Filer & Stowell, 18″x40″x48″, | $11,000 |
|  | 1 Leblanc condenser $5, | 1,980 |
|  | 4 H. R. T. 72″ boilers 20 ft. tubes Erie City. |  |
| Whitted. | 1 Heater—closed—225 sq. ft. heating surface—straight tubes—Jacobs, Wainwright or Berryman. |  |
|  | 1 Injector |  |
|  | 1 Feed pump—Wheeler 7½x5′6″ |  |
|  | 1 Oiling system |  |
|  | Piping complete |  |
|  | Pipe covering complete |  |
|  | Cross connect between cylinders, |  |
|  | Damper regulator to be optional. |  |
|  | Oil separators to be omitted. |  |
|  | May 29, '09, | $ 9,533 |

### Exhibit 3.

Proposal of Thomas B. Whitted & Co. to Fairfield Cotton Mills, Winnsboro, S. C., dated May 11, 1910, containing proposal and specifications for furnishing and installing boilers, condenser, feed pumps and other machinery.

[Signed] Thomas B. Whitted & Company.

It is insisted by plaintiff that after a full and free conference the terms contained in Exhibit No. 2 were agreed to by the defendant, and the cost for the performance of said work was then and there made by the parties. It further appears that thereafter when the matter was submitted to the engineer for the defendant, he was of opinion that, in

addition to the agreement as to the work to be done and the material to be furnished, certain additional equipment should be put in the plant. Thus a new element was introduced into the transaction which had to be considered by the plaintiff in so far as the price to be paid therefor was concerned, and in order that we may have an intelligent conception as to what actually transpired on the 29th day of May, and subsequent thereto, it becomes necessary to refer to certain parts of the written and oral testimony offered in the court below.

In a letter dated August 26th, the consulting engineer of the defendant company, among other things, used the following language:

"Your plans do not show any blow-off piping at all. We presume of course that you understand that under your contract this is to be installed and that the omission was an oversight."

And on the 28th day of June, Mr. Elliott, president of the defendant company, after giving his views as to the kind of condenser that should be installed, concludes as follows:

"And we will conclude the matter as per written specifications in his [Main's] office on May 29th."

The testimony for the plaintiff, as well as the various exhibits that were filed, indicate that between May 29th and September 28th negotiations were had between plaintiff and defendant as to changes and modifications that were desired by the defendant, as well as specifications and drawings. In other words, the testimony tends to show that, in addition to the specifications of what is alleged to be the original contract, there were certain changes, additions, and modifications which the defendant sought to have included as an addition to the original agreement between the parties. As a result of the negotiations between the parties final specifications as to the changes that had been made at the instance of the defendant and its engineer were submitted in the form of a written contract in September, the price of which appeared to be extravagant to the defendant, and at its request the plaintiff furnished an itemized list of the extras and the cost of the same.

As late as September 28th, the president of the defendant company, in a letter in which he refers to the extras that were to be furnished, among other things, said:

"I am satisfied that a considerable number of the items which you have made out as extras must have been included in the original contract."

This statement tends to support the contention of the plaintiff that there was a contract entered into between the parties on the 29th day of May.

The plaintiff insists that on the 29th day of May it was mutually agreed between the parties that for the work to be done and the material to be furnished by the plaintiff, defendant was to pay the sum of $9,533; that then and there, as a result of the agreement between the parties, the defendant prepared a memorandum, to wit, Exhibit 2, which, among other things, contains the following heading, "Apparatus decided upon," also in the right-hand marginal corner thereof is the statement, $9,533. This memoranda was delivered by the defendant to the plaintiff, and Exhibit No. 3, which accompanies the same, re-

cites that the memoranda contained proposals and specifications for installing boilers, etc., and is signed by Thomas B. Whitted & Co., and that upon this definite proposition the minds of the parties met, and the contract to all intents and purposes became complete; that the agreement to reduce the contract to writing at a future day 'could, in no wise, affect the rights of the parties in so far as the agreement on the 29th day of May was concerned. It was but natural that the agreement, in so far as the details and specifications were concerned, should be reduced to writing, but if the parties at that time mutually agreed as to the work and amount of material to be furnished, and the defendant agreed to pay therefor a definite sum, to wit, the sum of $9,533, then in that event the agreement became a binding contract upon the parties, and any negotiations the parties may have had thereafter as to the extras or additions could in no wise affect the rights of the parties under the agreement of that date.

[2] It has been held that, where parties enter into a verbal contract with the understanding that the same should be reduced to writing, and for some reason it was not reduced to writing and signed, such contract is binding upon the parties.

In the case of Sanders v. Fruit Co., 144 N. Y. 209, 39 N. E. 75, 29 L. R. A. 431, 43 Am. St. Rep. 757, the Supreme Court of New York announces that rule to be as follows:

"A contract to make and execute a certain written agreement, the terms of which are mutually understood and agreed upon, is, in all respects, valid and obligatory, where no statutory objection interposes, as the written contract itself would be, if executed. If, therefore, it should appear that the minds of the parties had met; that a proposition for a contract had been made by one party and accepted by another; that the terms of this contract were in all respects definitely understood and agreed upon; and that a part of the mutual understanding was that a written contract, embodying those terms, should be drawn and executed by the respective parties—this is an obligatory contract, which neither party is at liberty to refuse to perform."

In the case of Drummond v. Crane, 159 Mass. 577, 35 N. E. 90, 23 L. R. A. 707, 38 Am. St. Rep. 460, Mr. Justice Holmes says:

"The considerations which we have put forward are not affected by the fact that the contract sued upon contemplated another more formal contract. That is merely an additional wheel in the machinery."

In the case of Jenkins & Reynolds Co. v. Cement Co., 147 Fed. 641, 77 C. C. A. 625, the Circuit Court of Appeals for the Sixth Circuit in referring to this question, said:

"* * * Now it is well settled that, though the parties to a verbal agreement contemplate that it is to be reduced to writing and signed, yet if the understanding is that this is to be done simply as a memorial of the agreement, it is binding, notwithstanding it is never put to writing. In the case of Pratt v. Railroad Co., 21 N. Y. 308, Judge Selden said: 'A contract to make and execute a certain written agreement, the terms of which are mutually understood and agreed upon, is to all respects as valid and obligatory, where no statutory objection interposes, as the written contract itself would be if executed. If, therefore, it should appear that the minds of the parties had met; that a proposition for a contract had been made by one party and accepted by the other; that the terms of the contract were in all respects definitely understood and agreed upon; and that a part of the mutual understanding was that a written contract embodying these terms should be drawn

and executed by the respective parties—this is an obligatory contract, which neither party is at liberty to refuse to perform.'

"And Judge Cofer in the case of Bell v. Offutt, 10 Bush. [Ky.] 632, said: 'If two persons enter into a verbal agreement about a matter as to which an enforceable parol contract can be made, it would be no defense when one of them is sued for a breach of the contract that he understood it would not be obligatory unless reduced to writing; nor does a contemporaneous agreement to reduce a contract to writing make its validity depend upon its being actually reduced to writing and signed. The agreement to put in writing amounts to no more than an agreement by the parties to provide a particular kind of evidence of the terms of their contract. and no more prevents its enforcement upon other legal evidence than an agreement that they would go to a named individual and state to him the terms of their contract would render the testimony of any other competent witness inadmissible to prove what the contract was.'

" * * *  Here, according to Grey's testimony, every possible detail of the contract was agreed upon. Nothing was left open to be thereafter determined, and a memorandum was made by him, and inspected and accepted as correct by Monohan, if not of the terms of the agreement, of the defendant's proposition upon which the agreement was based. The evidence tends to show that the reduction of the agreement to writing was contemplated as a memorial thereof, and not as the conclusion of a contract. Point is made of the fact that in the letter of April 24th reference is made to the nonreceipt of a letter from Monaghan confirming the verbal agreement, and anxiety is expressed to have matters settled, so that it might know what to expect in the way of shipments. This is not inconsistent with the understanding having been that the reduction of the agreement to writing was for the purpose of having a memorial thereof. If such was the case, until it was reduced to writing matters would be unsettled, and cause for anxiety would exist. At any rate, it certainly cannot be said that all reasonable men would conclude that the meaning of the parties was that the agreement was not binding in law until it was put into writing. Just what the meaning and intention of the parties in regard to the agreement being put into writing was, was a question for the jury under proper instructions."

It is insisted by defendant that the alleged contract was not in writing, and therefore prohibited by the statute of frauds of South Carolina. So much of the statute as is pertinent to this question is embraced in section 3738 of the Civil Code of South Carolina, 1912, as follows:

"No contract of the sale of any goods, wares or merchandise for the price of $50.00 or upwards shall be allowed to be good except the buyer shall accept part of the goods so sold and actually receive the same, or give something in earnest to bind the bargain, or in part payment, or that some note or memorandum in writing of the said bargain be made and signed by the parties to be charged by such contract, or their agents thereunto lawfully authorized."

It is contended by plaintiff that Exhibit 2 within itself is sufficient to constitute a contract under the statute of frauds, and no form of signature to this paper was necessary. And, further, that if Exhibit 2 be insufficient, the correspondence, letters, and telegrams of the defendant, recognized and acting on it, are sufficient to bind it.

The letters written by defendant and its engineer to the plaintiff to which we have referred tend to show that the defendant recognized the fact that it had a contract with plaintiff for this particular work. This, taken in connection with Exhibit 2, forms the basis for plaintiff's contention, and it involves a question of fact bearing upon the point as to whether this contract is prohibited by the statute of frauds of the state

of South Carolina, and, as such, should have been submitted to the jury for its determination.

In the case of Ryan v. U. S., 136 U. S. 68, 10 Sup. Ct. 913, 34 L. Ed. 447, Justice Harlan, speaking for the Supreme Court, said:

"But the defendant insists that the alleged contract between him and the government was not valid or binding under the statute of frauds of Michigan, which provided that 'every contract for the leasing for a longer period than one year, or for the sale of any lands, or interest in lands, shall be void, unless the contract, or some note or memorandum thereof, be in writing and signed by the party by whom the lease or sale is to be made, or by some person by him lawfully authorized by writing.' Howell's Stat., § 6181. His contention is that the writings, including telegrams, which are relied upon to establish a valid, binding contract, do not, in themselves, show that the lands therein referred to are the lands in question, and therefore no written memorandum, such as the statute requires, was executed. In support of this view we are referred to Gault v. Stormont, 51 Mich. 636, 638 [17 N. W. 214]. In that case, the memorandum was only a receipt, given at Wyandotte, Mich., by the party selling, showing that he had received from the party proposing to buy 'the sum of $75.00 as part of the principal of $1,050 on sale of my house and two lots on corner of Superior and Second streets in this city.' This receipt was held to be insufficient to answer the requirements of the statute, for the reason that 'though it specified the purchase price, it failed to express the time or times of payment, and there is no known and recognized custom to fix what is thus left undetermined'; the court adding that 'a memorandum, to be sufficient under the statute, must be complete in itself, and leave nothing to rest in parol.' It will be observed that the memorandum in that case was not rejected as insufficient because of any want of fullness in the description of the premises, nor is there any intimation that such description (if the case had turned upon that point), might not have been aided by extrinsic parol evidence, identifying the premises intended to be sold. That case did not in any degree modify the decision in Eggleston v. Wagner, 46 Mich. 610, 618 [10 N. W. 37, 41], where the court said: 'A further objection is that the proposal did not sufficiently describe the real estate to satisfy the statute of frauds. The general principle is not questioned. The degree of certainty with which the premises must be denoted is defined in many books, and the cases are extremely numerous in which the subject has been illustrated. They are all harmonious. But they agree in this: That it is not essential that the description have such particulars and token of identification as to render a resort to extrinsic aid entirely needless when the writing comes to be applied to the subject-matter. The terms may be abstracted and of a general nature, but they must be sufficient to fit and comprehend the property which is the subject of the transaction; so that, with the assistance of external evidence, the description, without being contradicted or added to, can be connected with and applied to the very property intended and to the exclusion of all other property. The circumstances that in any case a conflict arises in the outside evidence cannot be allowed the force of proof that the written description is in itself insufficient to satisfy the statute.'

"Did the paper which passed between the parties, constituting the memorandum of the transaction, contain such a description of the lands in dispute as was sufficient, in connection with extrinsic evidence not contradictory of nor adding to the written description, to meet the requirements of the Michigan statute of frauds? We say 'the papers,' because the principle is well established that a complete contract, binding under the statute of frauds, may be gathered from letters, writings, and telegrams between the parties relating to the subject-matter of the contract, and so connected with each other that they may be fairly said to constitute one paper relating to the contract. Beckwith v. Talbot, 95 U. S. 289, 292 [24 L. Ed. 496]; Ridgway v. Wharton, 6 H. L. Cas. 238; Coles v. Trecothick, 9 Ves. 234, 250; Cave v. Hastings, 7 Q. B. D. 125, 128; Long v. Millar, 4 C. P. D. 450, 456."

We are of the opinion that the memorandum, together with the letters that passed between the parties, should have been submitted to the jury in connection with the other evidence of the plaintiff bearing upon the question as to whether a valid contract was entered into between the parties on the 29th day of May.

In view of what we have said, it follows that the court below erred in refusing to submit these questions to the jury.

For the reasons hereinbefore stated, the judgment of the lower court is reversed.

Reversed.