## CLEVELAND TRUST CO. v. LAMBORN et al.

### No. 5512.

Circuit Court of Appeals, Sixth Circuit.
Nov. 11, 1930.

W. H. Boyd, of Cleveland, Ohio (Boyd, Cannon, Brooks & Wickham, Richard S. Douglas, and W. D. Cole, all of Cleveland, Ohio, on the brief), for appellant.

Clan Crawford, of Cleveland, Ohio (Van Doren, Conklin & McNevin, of New York City, Squire, Sanders & Dempsey, of Cleveland, Ohio, and Louis O. Van Doren and Alfred C. B. McNevin, both of New York City, on the brief), for appellees.

Before DENISON, MOORMAN, and HICKS, Circuit Judges.

MOORMAN, Circuit Judge.

This is the second appeal of this case. On the former we held, 29 F.(2d) 46, that the lower court should have directed a verdict for the plaintiff because the trust company was estopped from making the defense upon which it relied. We did not deem it necessary to pass upon the merits of the defense; that is, the sufficiency of the documents supporting plaintiffs' draft. Upon the retrial, the court directed a verdict in accordance with our opinion. The evidence on that trial was in the main the same as that introduced on the first. The defendant contends that it was made different by the testimony of three witnesses, Friedman, president of the Ohio Confection Company, Kollie, vice president of the defendant trust company, and Horton, an officer of the Central National Bank. Some of the testimony of these witnesses was excluded. We treat it all as received, but we find no reason for changing our former holding.

Friedman did not testify on the first trial. On the second he testified that about a quarter to 3 on the afternoon of December 7th he called at the Central National Bank and examined the draft with its supporting papers; that he had a telephone conversation from Horton's desk with Kollie and informed Kollie that the papers made no reference to the word "granulated"; and that Kollie requested him "to state that [to Horton] as a further reason for the non-payment." This he said he did. Kollie said he talked to Friedman (it is not avowed, but presumably on the telephone); that Friedman told him the shipping documents did not conform to the description in the letter of credit; and that he instructed Friedman "to so advise Mr. Horton of the difference in the description as a part of the refusal to honor the draft." Horton admitted that he talked with Friedman on the 7th, but he had no recollection of Friedman's calling his attention to any deficiency in the papers or delivering any such message to him from Kollie, and this notwithstanding his recollection had been refreshed about three weeks before the trial by Friedman, who was brought to his desk by another employee of the bank who informed Horton that "an account was being opened for Mr. Friedman in our bank."

Kollie's testimony in regard to his conversation with Friedman is in direct conflict with his testimony given on the former trial. On that occasion he said he was informed of the draft by telephone and refused to pay it on the ground that he was enjoined from doing so. He was asked specifically whether any information was given him at that time as to the contents of any of the documents accompanying the draft, and his answer was, "There was not." Then he was asked, "And did you get any such information at all between that time and the 18th day of December of that year?" His answer was, "I did not." This evidence is not only inconsistent with Kollie's new testimony, but also contradicts that given by Friedman. Moreover, the other evidence in the case shows conclusively, we think, that the defendant's refusal to honor the draft was based solely upon the order of injunction. Kollie himself testified on both trials that three times on December 7th he refused payment for that reason and no other. We note, also, that his new testimony makes the discrepancy only a "part of the refusal," and similarly, according to Friedman, it was to be given "as a further reason for the non-payment." Another pertinent consideration is that it would be most unusual for a responsible officer of a bank, charged with the duty of honoring or dishonoring a letter of credit, to send the president of the holder of the letter to examine the documents and formulate the bank's reasons for not paying. Specifically, what is even more extraordinary is that, when informed of a deficiency in the papers, Kollie, if he was willing to accept this unverified information, should not at least have asked to speak with Horton and himself notified Horton of the further reason. Especially does it seem that he would have followed this

latter course when he had already declined payment for another reason. We doubt, in these circumstances, that the new testimony relied upon is of such substance as amounts to evidence for a jury. Jenkins & Reynolds Co. v. Alpena Portland Cement Co., 147 F. 641 (6 C. C. A.); Toledo, St. L. & W. R. Co. v. Howe, 191 F. 776 (6 C. C. A.); Dustin Grain Co. v. McAllister (C. C. A.) 296 F. 611.

■ Passing, however, the lack of substance in this additional testimony, we observe that the record shows that on December 7th, at 10:50 a. m., the Royal Bank of Canada sent a telegram to defendant expressing its understanding that defendant's refusal to pay was based on the order of injunction. This telegram meant that the bank had refused payment either quite early on the morning of that day or on the day before, December 6th. Before the conversation which Friedman said occurred, the defendant had therefore definitely and finally refused to pay and had given to the drawers, as its sole reason for so doing, the order of injunction. The Bank of Canada too had then accepted this reason and was never advised of any other. So, at the time that Friedman claimed to have had the conversation with Horton, the action of the defendant had already been such as to raise estoppel. Accordingly, if the defendant thereafter desired to change its position so as to render what it had done ineffective, it could do so only if in the meantime the plaintiffs had not suffered injury or damage by relying upon the reason that it had first given, and it could do so then only by definitely bringing to plaintiffs' attention this further reason for its action. It knew that the Bank of Canada had accepted as the basis of its action the reason that it had theretofore given. It further knew that hours were vital to the plaintiff; yet, although the Bank of Canada had taken the matter up with it directly, it remained silent and neither notified that bank nor the plaintiff of any reason other than it had originally given. After the Central Bank had performed its duty of notifying the drawer of the defendant's reason for the refusal, and after the Bank of Canada had accepted that reason and undertaken to deal directly with the defendant, we doubt that the Central Bank continued as the agent of the Bank of Canada to receive further notice. Certainly the duty rested heavily upon defendant to see that its changed position was brought home to the Bank of Canada or the plaintiff. The proofs do not show that this was done. Horton said that he had no recollection of having been given any further notice. Nothing in his later conduct nor in the defendant's indicates that such notice was given to any one. The estoppel, in our opinion, remained effective and complete.

■■ It was not error to refuse to admit in evidence the letter from the Bank of Canada of December 20, 1920. That letter was offered as tending to show that plaintiffs had been paid for the sugar by the Bank of Canada. There was no defense of payment made in the pleadings. Besides, the letter was unverified and was not evidence of what it purported to state. Nor was it error to receive as evidence the contract between the plaintiffs and the confection company. Even if the contract was inadmissible, it has been given no consideration in connection with the point on which the case has been decided, and hence its admission was not prejudicial.

The judgment is affirmed.